RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 05a0231p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

ROSSIE MARIE MILLER, Personal Representative of
the Estate of JOHN KING LINDSAY STANFORD,
Deceased,

  *Plaintiff-Appellant,*

  *v.*

CALHOUN COUNTY; SHERIFF ALLEN L. BYAM;
CAPTAIN TERRY COOK; SERGEANT MICHELLE
LINDSAY; DEPUTY MELINDA OSTEEN; DEPUTY
LAPHAM; DEPUTY JEFFREY S. HOLLEY; DEPUTY
HOLLY THOMAS; SERGEANT MARCIA LEAVELL;
DEPUTY EVERETT; DR. MEHMET B. ISMAILOGLU,

  *Defendants-Appellees.*

No. 03-2434

---

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 01-00245—Hugh W. Brenneman, Jr., Magistrate Judge.

Argued: April 19, 2005

Decided and Filed: May 27, 2005

Before: SUHRHEINRICH and GILMAN, Circuit Judges; and ACKERMAN, District Judge.[*]

---

## COUNSEL

**ARGUED:** Mark R. Bendure, BENDURE & THOMAS, Detroit, Michigan, for Appellant. Joseph
Nimako, CUMMINGS, MCCLOREY, DAVIS & ACHO, Livonia, Michigan, Randy J. Hackney,
HACKNEY, GROVER, HOOVER & BEAN, East Lansing, Michigan, for Appellees. **ON BRIEF:**
Mark R. Bendure, BENDURE & THOMAS, Detroit, Michigan, for Appellant. Joseph Nimako,
CUMMINGS, MCCLOREY, DAVIS & ACHO, Livonia, Michigan, Randy J. Hackney, Loretta B.
Subhi, HACKNEY, GROVER, HOOVER & BEAN, East Lansing, Michigan, for Appellees.

---

[*]The Honorable Harold A. Ackerman, United States District Judge for the District of New Jersey, sitting by
designation.

1

———————

## OPINION

———————

HAROLD A. ACKERMAN, District Judge. Plaintiff, Rossie Marie Miller, appeals from two orders of the District Court granting summary judgment in favor of all of the defendants in this wrongful death action brought pursuant to 42 U.S.C. § 1983 and denying Miller's motion for leave to amend the Complaint. Miller initiated the action after her brother, John King Lindsay Stanford, died of a brain tumor on April 26, 1998 while in pretrial custody at the Calhoun County Correctional Facility (the "Correctional Facility") in Calhoun County, Michigan (the "County"). The Complaint alleges that the County's policies governing the provision of medical care to inmates and the training of Correctional Facility staff were deliberately indifferent and grossly negligent with respect to the serious medical needs of inmates, in violation of the Eighth Amendment. The Complaint further alleges that numerous individual corrections officer defendants had been deliberately indifferent to Stanford's serious medical condition in the days and hours leading up to his death. Finally, the Complaint alleges that the Correctional Facility's on-call physician, Dr. Mehmet Ismailoglu, had been deliberately indifferent and grossly negligent with respect to Stanford's medical condition. The District Court concluded that Miller failed to demonstrate that any of the defendants were deliberately indifferent to Stanford's medical condition in violation of his Eighth Amendment rights. In addition, the District Court denied Miller's motion for leave to amend the Complaint to allege that Dr. Ismailoglu was a policymaker for purposes of municipal liability under *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986). For the reasons discussed below, we **AFFIRM**.

## I. BACKGROUND

At 1:02 a.m. on Friday, April 24, 1998, John King Lindsay Stanford, then 44 years old, was booked into the Correctional Facility in Battle Creek, Michigan and placed in pretrial detention on charges of auto theft. As part of the booking procedure, Stanford was asked a number of questions regarding his medical history. In response to one such question, Stanford indicated that he had sustained a head injury approximately one month earlier. He did not disclose any further details of his injury, however, except to report that his injury was not causing him any problems at that time. The booking officer recorded this information in Stanford's file.

Stanford was assigned to share a cell with inmate Michael Owen. Owen later reported that shortly before 6:00 p.m. on Friday, April 24, Stanford complained of a headache to a guard and requested aspirin. Owen further reported that sometime in the afternoon of Saturday, April 25, Stanford again complained of a headache to a guard, and again requested aspirin. According to Owen, Stanford made a third request for aspirin around 7:00 p.m. on Saturday evening.

At approximately 11:50 p.m. on Saturday, April 25, Stanford approached two corrections officers—Deputies Osteen and Lapham—and again requested pain medication for a headache behind his eye. Osteen left to obtain the necessary approval from Sergeant Lindsay, the shift commander, and returned at about ten minutes past midnight with two Motrin tablets.

At approximately 12:30 a.m. on April 26, Lapham appeared at Stanford's cell in response to pounding on the door by Owen. Owen later stated that he had been pounding for at least several minutes before the deputy arrived. When Lapham entered the cell, he observed Stanford lying face-up on the floor of the cell in a puddle of water. Although Stanford was awake, he did not appear to be aware of Lapham's presence, and did not respond to the deputy's verbal inquiries. Lapham immediately radioed Lindsay to report a medical situation. While they were waiting for help to arrive, Owen advised Lapham that Stanford had fallen out of bed three times in short succession.

Within a brief time, Lindsay arrived at the cell, along with Deputies Osteen, Everett, and Taylor. Lindsay observed water on the floor and noted that the front of Stanford's pants was wet. Upon questioning, Owen advised the sergeant that Stanford had dropped a cup of water when he fell. Lindsay then asked Stanford whether he had hit his head when he fell, to which Stanford, now responsive, stated that he had not. In the meantime, Lapham left the cell to retrieve Stanford's medical profile, and reported back to Lindsay that Stanford had sustained a recent head injury. Stanford advised the officers that he had been in pain since the early evening of April 25. He complained of severe pain in his eyeballs. When Lindsay asked whether Stanford had suffered any head injuries, Stanford replied that he had, "about a year and a half ago." Joint Appendix ("J.A.") at 284. Lindsay checked Stanford's pulse at this time and found it to be strong and steady.

The officers placed Stanford in a wheelchair and transported him to the prisoner intake area ("Intake") for observation. Lindsay, Lapham, and Taylor accompanied Stanford. Lapham reported that on "numerous occasions" along the way, the officers had to stop and "sit inmate Stanford back up in the chair" because "he kept sliding out." J.A. at 283. Lindsay later opined that this was "probably not uncommon" because the wheelchair was an older model lacking footrests. J.A. at 625 (Lindsay Dep. at 10:25–11:3). During one of these stops, Lindsay inquired whether Stanford could see her, and Stanford responded, "You look like Mickey to me," J.A. at 284, an apparent reference to Lindsay's nickname. Lindsay then asked whether Stanford could see her clearly or whether she was blurry, to which Stanford replied that he could see her "ok." J.A. at 284. Lindsay also asked Stanford whether he was under the influence of any street drugs and whether he had a history of diabetes; Stanford responded to both questions in the negative. Taylor reported that during this period, Stanford appeared "coherent to some degree" but "very disoriented." J.A. at 287.

Upon arrival at Intake, the deputies assisted Stanford in changing into dry clothing. Meanwhile, Lindsay accessed Stanford's computer file and phoned Dr. Mehmet Ismailoglu, the on-call physician for the Correctional Facility. Lindsay advised the doctor that Stanford had fallen, was initially unresponsive to questioning, but had later spoken responsively and coherently to her. In addition, Lindsay told the doctor that Stanford's pupils were equally dilated, and that he had earlier complained of a headache behind his right eye. Lindsay also informed the doctor that Stanford had reported sustaining a head injury in the past, although she later could not recall whether she told the doctor that the injury occurred a month or a year and a half earlier.

Dr. Ismailoglu advised Lindsay that medical staff would see Stanford in the morning. Lindsay suggested that the Intake staff monitor Stanford on a half-hourly basis, and Dr. Ismailoglu agreed. Dr. Ismailoglu later testified that "there was not anything striking about the call I got from the jail. There was no urgency in the message that I got. There was nothing there to alert me that I should either respond physically or call for – have them call for 911 to have this individual transported." J.A. at 666 (Ismailoglu Dep. at 28:7–13). The record reflects that Lindsay's phone call to Dr. Ismailoglu lasted 1.9 minutes. J.A. at 55, 201, 667 (Ismailoglu Dep. at 29:19); Ismailoglu's Br. at 8. At deposition, Dr. Ismailoglu could not specifically recall having been told that Stanford had reported a recent head injury, that he was initially unresponsive, or that he was unable to remain seated in the wheelchair while en route to Intake.

Intake staff initiated a thirty-minute log shortly before 1:00 a.m. on April 26 and made observations of Stanford roughly every half hour for the next seven hours. The stated reason for initiating the log was "possible seizure." J.A. at 288. Stanford's cell was equipped with a mattress, which was placed directly on the floor. For most of the night, Intake staff observed Stanford "rolling around on floor." J.A. at 288–89, 290. Nevertheless, the record reflects that when officers spoke to Stanford, they found him to be responsive and coherent. J.A. at 291, 741. At approximately 1:30 a.m., Stanford requested a Snickers bar, stating that he thought his blood sugar was low and that this might be causing his headache. The Intake staff administered a blood sugar test and confirmed a normal reading. Three hours later, Stanford was observed masturbating. The entry for 7:30 a.m.

shows that Stanford was "[m]oving, appears o.k." J.A. at 289. Likewise, the entry for 8:00 a.m. reflects that Stanford was "[l]ying in the bed area, appears o.k." J.A. at 289. The record reflects that throughout the night Stanford's condition "neither worsend [sic] or improved." J.A. at 290.

At 8:10 a.m., the log shows that Stanford was found "[l]ying on floor, toilet area, foot shaking and moving, wet in pants area as if to have urinated on himself." J.A. at 289. The entry further notes that "Sgt. contacted Master who in turn contacted medical. Medical Responded." J.A. at 289. Sergeant Leavell, who made the discovery, reported that Stanford appeared to be having a seizure. Leavell summoned a nurse, who in turn called an ambulance. The ambulance arrived within seven minutes and transported Stanford to the emergency room at the Community Hospital.

Hospital records indicate that Stanford was comatose when he arrived at the emergency room at approximately 8:45 a.m. J.A. at 295, 297. Dr. Ismailoglu was again contacted. The evaluating physician at the hospital diagnosed Stanford as suffering from a "massive right vasoganglion hemorrhage" and recommended that surgery not be performed. J.A. at 295. Stanford's condition deteriorated throughout the day. He died at 4:20 p.m. on Sunday, April 26, 1998. It was later determined that the cause of death was a "Primary Brain Tumor – Astrocytoma." J.A. at 294 (Certificate of Death).

On April 18, 2001, Rossie Marie Miller, Stanford's sister, initiated this action in the Western District of Michigan, Southern Division, seeking relief under 42 U.S.C. § 1983. The District Court had federal question jurisdiction over the case pursuant to 28 U.S.C. § 1331. Counts I and II of the Complaint allege that defendants Calhoun County, Sheriff Allen L. Byam, and jail administrator Captain Terry Cook (collectively the "County Defendants") had been deliberately indifferent and grossly negligent with respect to Stanford's medical needs during his period of incarceration. Count III alleges that defendants Lindsay, Osteen, Lapham, Deputy Jeffrey Holley, Deputy Holly Thomas, Leavell, and Everett (collectively the "Corrections Officer Defendants") likewise had been deliberately indifferent and grossly negligent with respect to Stanford's medical needs during his period of incarceration. Count IV alleges deliberate indifference and gross negligence on the part of Dr. Ismailoglu. The case ultimately was assigned to Magistrate Judge Hugh W. Brenneman, Jr., and the parties consented to Judge Brenneman exercising full judicial authority pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.[1]

On May 15, 2002, Dr. Ismailoglu moved for summary judgment. Oral argument on the motion was heard on August 21, 2002. The County Defendants and Corrections Officer Defendants moved to dismiss and/or for summary judgment on September 19, 2002. Shortly thereafter, on September 26, 2002, Miller sought leave to amend the Complaint to allege that Dr. Ismailoglu was a "policymaker" for purposes of § 1983. On November 26, 2002, oral argument was heard jointly on the County Defendants' and Corrections Officer Defendants' motion to dismiss and/or for summary judgment and Miller's motion for leave to amend. In an Opinion dated February 12, 2003 and an Order dated March 6, 2003, the District Court granted Dr. Ismailoglu's motion for summary judgment. Thereafter, on September 29, 2003, the District Court issued an Opinion and an Order denying Miller's motion to amend as futile and granting summary judgment for the County Defendants and Corrections Officer Defendants. Miller now appeals those rulings. This Court has jurisdiction over the present appeal pursuant to 28 U.S.C. § 1291.

## II. ANALYSIS

This Court reviews a district court's grant of summary judgment *de novo. Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 629 (6th Cir. 2002). Summary judgment is appropriate only

---

[1]We will hereafter refer to Judge Brenneman as the "District Court."

where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A district court faced with a summary judgment motion must view all evidence and the inferences to be drawn therefrom in the light most favorable to the non-movant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The critical inquiry for a district court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

In the specific context of a § 1983 action, the non-moving party "must demonstrate a genuine issue of material fact as to the following 'two elements: 1) the deprivation of a right secured by the Constitution or laws of the United States and 2) [that] the deprivation was caused by a person acting under color of state law.'" *Johnson v. Karnes*, 398 F.3d 868, 873 (6th Cir. 2005) (quoting *Ellison v. Garbarino*, 48 F.3d 192, 194 (6th Cir.1995)). As there is no dispute that Defendants in this case acted under color of state law, this Court's inquiry must focus on whether there was an actionable deprivation of a right secured under the Constitution or the laws of the United States.

"Deliberate indifference" by prison officials to an inmate's serious medical needs constitutes "unnecessary and wanton infliction of pain" in violation of the Eight Amendment's prohibition against cruel and unusual punishment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). Although the Eighth Amendment's protections apply specifically to post-conviction inmates, *see Barber v. City of Salem, Ohio*, 953 F.2d 232, 235 (6th Cir. 1992), the Due Process Clause of the Fourteenth Amendment operates to guarantee those same protections to pretrial detainees as well. *Thompson v. County of Medina, Ohio*, 29 F.3d 238, 242 (6th Cir. 1994); *see also Molton v. City of Cleveland*, 839 F.2d 240, 243 (6th Cir. 1988) (stating that alleged violation of pretrial detainee's Eighth and Fourteenth Amendment rights is governed by the "deliberate indifference" standard). Where any person acting under color of state law abridges rights secured by the Constitution or United States laws, including a detainee's Eighth and Fourteenth Amendment rights, § 1983 provides civil redress. 42 U.S.C. § 1983; *e.g.*, *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388–89 (1989).

The Supreme Court has adopted a mixed objective and subjective standard for ascertaining the existence of deliberate indifference in the context of the Eighth Amendment:

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer v. Brennan*, 511 U.S. 825, 837 (1994). The objective component of the test requires the existence of a "sufficiently serious" medical need. *Blackmore v. Kalamazoo County*, 390 F.3d 890, 895 (6th Cir. 2004). A sufficiently serious medical need is predicated upon the inmate demonstrating that he or she "is incarcerated under conditions imposing a substantial risk of serious harm." *Id.* (quoting *Farmer*, 511 U.S. at 834).

The subjective component, by contrast, requires a showing that the prison official possessed "a sufficiently culpable state of mind in denying medical care." *Id.* (quoting *Farmer*, 511 U.S. at 834). Deliberate indifference requires a degree of culpability greater than mere negligence, but less than "acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer*, 511 U.S. at 835. The prison official's state of mind must evince "deliberateness tantamount to intent to punish." *Horn v. Madison County Fiscal Court*, 22 F.3d 653, 660 (6th Cir. 1994). "Knowledge of the asserted serious needs or of circumstances clearly indicating the existence of such needs, is essential to a finding of deliberate indifference." *Id.* Thus, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for

commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838.

### A.       The District Court Did Not Err in Granting Summary Judgment for the County Defendants

A body politic is a "person" within the meaning of § 1983. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). The statute, however, does not permit a municipal entity to incur liability under a theory of *respondeat superior*. *Id.* at 691. Rather, a municipality may be held liable under § 1983 only where its policy or custom causes the constitutional violation in question. *Id.* at 694. Municipal liability may attach for policies promulgated by the official vested with final policymaking authority for the municipality. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 482–83 (1986). Whether a given individual is such a "policymaker" for purposes of § 1983 liability is a question of state law. *Id.* at 483.

In the proceedings below, Miller alleged that the County Defendants were deliberately indifferent to Stanford's serious medical needs by failing to provide adequate medical screening and treatment of inmates, and by failing to implement and enforce adequate procedures for the hiring and training of Correctional Facility staff, medical personnel, and professionals. The District Court rejected these allegations, finding that Miller had presented no evidence that the Correctional Facility engaged in a clear and persistent pattern of mistreatment of detainees, and no evidence that other detainees at the Correctional Facility had been subjected to the same alleged mistreatment. Policies and procedures were in place requiring corrections officers to contact a physician in the event of a medical emergency, the District Court found, and those procedures were followed during Stanford's period of incarceration. The court rejected Miller's argument that the County Defendants failed to hire or train personnel to handle medical emergencies, finding that all of the officers at the Correctional Facility had received at least basic training in first aid and CPR. In addition, the court found no evidence that the corrections officers' training was inadequate. Finally, the court noted that the fact that a nurse is now on duty throughout the night at the Correctional Facility is not evidence that the County Defendants were deliberately indifferent at the time of Stanford's incarceration.

Miller now argues that the District Court erred in focusing on the written policies of the County Defendants without considering the *de facto* customs and practices in place at the Correctional Facility. Specifically, Miller contends that "the Sheriff and County delegated *de facto* decision-making to the shift commander and on-call doctor." Miller's Br. at 34. As such, Miller maintains that the deliberate indifference that Lindsay and Dr. Ismailoglu allegedly exhibited during Stanford's period of incarceration should be attributable to the County, as it reflects the County's official policy.

Although it is true that final policymaking authority may be delegated, *Pembaur*, 475 U.S. at 483, it is equally true that "mere authority to exercise discretion while performing particular functions does not make a municipal employee a final policymaker unless the official's decisions are final and unreviewable and are not constrained by the official policies of superior officials." *Feliciano v. City of Cleveland*, 988 F.2d 649, 655 (6th Cir. 1993). "[C]onsideration should . . . be given to whether the employee . . . formulates plans for the implementation of broad goals." *Hager v. Pike County Bd. of Educ.*, 286 F.3d 366, 376 (6th Cir. 2002) (quoting *Faughender v. City of N. Olmstead, Ohio*, 927 F.2d 909, 914 (6th Cir. 1991)). In light of this standard, Miller's argument finds no support in the record.

There is no dispute that under state law, Byam, as sheriff, enjoyed final policymaking authority over the Correctional Facility, and that he and his predecessor promulgated the "Procedures and Policies" that governed the Correctional Facility. However, Miller conflates

decisionmaking with policymaking when she insists that "Lindsay was, by county policy, the *de facto* decision-maker as to emergency care for inmates on the midnight shift." Miller's Br. at 34. Even assuming that Lindsay had been vested with authority to make limited decisions concerning inmate medical care during her shift, Miller fails to explain how this differs from "mere authority to exercise discretion." *Feliciano*, 988 F.2d at 655; *see also Pembaur*, 475 U.S. at 481–82 ("The fact that a particular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion."). Miller advances no argument and proffers no evidence that Lindsay's decisions were not subject to review, or that Lindsay possessed any authority to "formulate[] plans for the implementation of broad goals." *Hager*, 286 F.3d at 376. Indeed, Miller's only evidentiary support for her argument that Lindsay had been delegated policymaking authority is a citation to Byam's deposition testimony, in which the sheriff expressed his belief that the officers at the Correctional Facility followed protocol in dealing with Stanford. Such statements provide no support for the proposition that Lindsay had been delegated final authority to implement policy.[2]

To sidestep the absence of documentary evidence supporting her claim, Miller notes that § 1983 liability need not be predicated upon written policies, but may arise from custom. *Monell*, 436 U.S. at 690–91. However, Miller falls well short of establishing that the County adhered to an actionable "custom." "A municipal 'custom' may be established by proof of the knowledge of policymaking officials and their acquiescence in the established practice." *Memphis, Tenn. Area Local, Am. Postal Workers Union v. City of Memphis*, 361 F.3d 898, 902 (6th Cir. 2004). For a custom to give rise to *Monell* liability, the custom "must 'be so permanent and well settled as to constitute a custom or usage with the force of law.'" *Doe v. Claiborne County, Tenn.*, 103 F.3d 495, 507 (6th Cir. 1996) (quoting *Monell*, 436 U.S. at 691). Such a custom "must include '[d]eeply embedded traditional ways of carrying out state policy.'" *Id.* (quoting *Nashville, Chattanooga & St. Louis Ry. Co. v. Browning*, 310 U.S. 362, 369 (1940)).

Miller argues that the District Court "was in error in concluding that a County may not be responsible for the *de facto* customs and practices that characterize its actual operation." Miller's Br. at 34. The District Court, however, drew no such conclusion. In granting summary judgment for the County Defendants, the District Court properly applied the factors identified in *Doe v. Claiborne County*. That case, like the present case, involved a plaintiff who argued that § 1983 liability should attach against a municipal entity by virtue of prevailing custom within the municipality, namely, institutional inaction in the face of violations of substantive due process rights. *See Doe*, 103 F.3d at 507. In the instant case, the District Court, modifying the *Doe* factors to fit the facts presented, wrote that

> [t]o state a municipal liability claim under an "inaction" theory in the present case, plaintiff must establish:
> (1) the existence of a clear and persistent pattern of mistreatment of detainees;
> (2) notice or constructive notice on the part of the County;
> (3) the County's tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction; and
> (4) that the County's custom was the "moving force" or direct causal link in the constitutional deprivation.

*Miller v. Calhoun County*, No. 01-245, slip op. at 12 (W.D. Mich. Sept. 29, 2003) (citing *Doe*, 103 F.3d at 508). Indeed, contrary to Miller's assertion, the lower court's very application of *Doe*

---

[2]Even if it can be said that Lindsay was a "policymaker" whose single *ad hoc* decision may impose § 1983 liability on the County, the record, as discussed below, supports the District Court's conclusion that Lindsay did not act with deliberate indifference to Stanford's serious medical needs.

evinces the court's recognition that a municipality may be held liable for municipal custom under certain circumstances. Those circumstances are nevertheless absent from this case.

"'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 410 (1997). This in turn typically requires proof that the municipality was aware of prior unconstitutional actions by its employees and failed to take corrective measures. *Stemler v. City of Florence*, 126 F.3d 856, 865 (6th Cir. 1997). Additionally, a § 1983 plaintiff must prove that the municipal policies and practices directly caused the constitutional violation. *Gray ex rel. Estate of Gray v. City of Detroit*, 399 F.3d 612, 617 (6th Cir. 2005).

The District Court properly found that Miller failed to make the threshold showing of a clear and persistent pattern of mistreatment of detainees. Miller argues that the County is at fault for permitting a situation in which Lindsay, untrained in emergency medical care, bore complete responsibility for deciding whether to contact the on-call doctor and what information to convey to him. But Miller does not deny that the Correctional Facility had a policy whereby the shift commander was to contact the on-call doctor in the event of a medical emergency, or that Lindsay followed that policy on April 26, 1998. Miller further fails to adduce independent evidence tending to show that such a policy was unreasonable. *Gray*, 399 F.3d at 618 n.1 (stating that reasonable policies negligently administered do not give rise to a finding of deliberate indifference). Indeed, there is no evidence of similar incidents having previously occurred at the Correctional Facility such that the County would be on notice of the danger of constitutional violations. Under such circumstances, the District Court did not err in concluding that the County was not "deliberately indifferent" to Stanford's serious medical condition.

Miller contends, in a related argument, that the District Court overlooked the County's liability arising from its "failure to properly train those exercising constitutional authority over others." Miller's Br. at 37. It is settled that "[o]nly where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *Harris*, 489 U.S. at 389. Mere allegations that an officer was improperly trained or that an injury could have been avoided with better training are insufficient to prove liability. *Sova v. City of Mt. Pleasant*, 142 F.3d 898, 904 (6th Cir. 1998).

Miller offers no evidence supporting her allegation that the County's failure to train amounted to deliberate indifference to the medical needs of detainees at the Correctional Facility. Her argument pivots on Lindsay's admitted lack of emergency medical training, an argument that the District Court rejected. Lindsay testified at deposition that she had received 160 hours of training from the Department of Corrections that included instruction on handling certain medical situations, and that she was trained in first aid and CPR. J.A. at 617, 618 (Lindsay Dep. at 13:11–14, 18:6–7). Other corrections officers reported having received similar training. J.A. at 609 (Everett Dep. at 3:21), 644 (Holley Dep. at 5:9), 681–82 (Lapham Dep. at 4:25–5:1), 703, 705 (Osteen Dep. at 34:13, 41:12), 732 (Thomas Dep. at 4:9–10). Lindsay further testified that the Correctional Facility adhered to a medical policy whereby inmates were "initially checked by staff to find out what the problem is according to the inmate, and then that information is then relayed to the medical staff who handles the inmate's care from that point." J.A. at 617 (Lindsay Dep. at 14:6–9). To counter this evidence, Miller merely argues that a reasonable jury could find deliberate indifference on the part of the County. She offers no evidence beyond the facts of this case tending to show that the County's training and staffing policies were inadequate. There is no history of similar incidents at the Correctional Facility, nothing to show that the County was on notice, and nothing to show that the County's failure to take meliorative action was deliberate.

In the final equation, Miller bases her argument entirely on the circumstances surrounding her brother's death, but a single act may establish municipal liability only where the actor is a municipal "policymaker." *Pembaur*, 475 U.S. at 480. As the Supreme Court instructed in *Harris*, the question is

> whether that training program is adequate; and if it is not, the question becomes whether such inadequate training can justifiably be said to represent "city policy." It may seem contrary to common sense to assert that a municipality will actually have a policy of not taking reasonable steps to train its employees. But it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.

489 U.S. at 390; *see also Gray*, 399 F.3d at 617 (noting that the Supreme Court has adopted an objective "obviousness" standard for training program adequacy). Because Miller has failed to demonstrate that the Correctional Facility policies were objectively inadequate, much less that the County was deliberately indifferent to the obvious inadequacy of those policies, we find that the District Court did not err in rejecting, as a matter of law, Plaintiff's theory regarding failure to train.

In summary, we believe that the record amply supports a conclusion that the District Court did not err in finding that Lindsay was not a "policymaker" for purposes of § 1983. Further, the District Court did not err in finding that Miller failed to satisfy the *Doe* factors and failed to submit any evidence to support a failure-to-train theory of liability. Accordingly, we affirm the lower court's grant of summary judgment for the County Defendants.[3]

### B.     The District Court Did Not Err in Denying Plaintiff's Motion for Leave to Amend the Complaint

On September 26, 2002, Miller sought leave to amend her Complaint to allege that Dr. Ismailoglu was a "policymaker" for purposes of *Pembaur* liability. The District Court denied the motion for leave to amend, finding no basis in Michigan law to support the legal conclusion that Dr. Ismailoglu was a policymaker. Thus, the District Court concluded that amendment of the Complaint would be futile. Miller now renews her argument that Dr. Ismailoglu was a municipal policymaker.

A party may amend its pleading once as a matter of course at any time before the responsive pleading is served. Fed. R. Civ. P. 15(a). After a responsive pleading has been served, a party may amend its pleading only by leave of court, and "leave shall be freely given when justice so requires." *Id.* A court need not grant leave to amend, however, where amendment would be "futile." *Foman v. Davis*, 371 U.S. 178, 182 (1962). Amendment of a complaint is futile when the proposed amendment would not permit the complaint to survive a motion to dismiss. *Neighborhood Dev. Corp. v. Advisory Council on Historic Pres.*, 632 F.2d 21, 23 (6th Cir. 1980). Where a district court

---

[3]The District Court, in a footnote, found no evidence that Defendants Byam and Cook were personally involved in the alleged misconduct. Because § 1983 liability cannot be imposed under a theory of *respondeat superior*, proof of personal involvement is required for a supervisor to incur personal liability. *Taylor v. Mich. Dep't of Corr.*, 69 F.3d 76, 80–81 (6th Cir. 1995). On appeal, Miller makes no argument that Byam or Cook should incur personal, supervisory liability. Indeed, Miller presents no evidence or argument that these two defendants had any personal involvement in the alleged misconduct. Accordingly, as it appears that Byam and Cook are being sued in their official capacities, we treat the claims against them as being claims against the County. *See Leach v. Shelby County Sheriff*, 891 F.2d 1241, 1245 (6th Cir. 1989). For the reasons discussed above, we find that the District Court did not err in granting summary judgment for Byam and Cook.

draws a legal conclusion that amendment would be futile, that conclusion is reviewed *de novo*. *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 625 (6th Cir. 2002).

Miller argues that Dr. Ismailoglu was a municipal policymaker, and that in holding to the contrary, the District Court focused exclusively on the County's written policies while ignoring *de facto* customs and practices. Accordingly, Miller does not appear to dispute the District Court's finding that state law confers final policymaking authority for county jails on the sheriff and jail administrator. Rather, Miller's position on appeal is that the sheriff and jail administrator "delegated *de facto* decision-making to the shift commander and on-call doctor." Miller's Br. at 34. It was in the exercise of this delegated authority, Miller argues, that Dr. Ismailoglu became a policymaker.

Miller's argument with respect to Dr. Ismailoglu suffers from the same deficiencies as her argument with respect to Lindsay. In particular, Miller does not differentiate between policymaking and "mere authority to exercise discretion." *Feliciano*, 988 F.2d at 655. Only the former confers § 1983 liability on a municipality. *See Pembaur*, 475 U.S. at 481–82 ("The fact that a particular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion."). Miller glosses over the fact that policymaking implies the power to "formulate[] plans for the implementation of broad goals." *Hager*, 286 F.3d at 376 (internal quotation marks omitted). A policymaker's decisions "are final and unreviewable and are not constrained by the official policies of superior officials." *Feliciano*, 988 F.2d at 655.

Miller makes no argument and advances no evidence that Dr. Ismailoglu possessed authority to set broad goals with respect to the medical treatment of inmates at the Correctional Facility. To the contrary, the record reflects that Dr. Ismailoglu contracted to provide on-site services for approximately eight hours per week, and to be on call 24 hours a day. J.A. at 561–62 (Byam Dep. at 18:24–19:12), 662 (Ismailoglu Dep. at 10:3–15). With respect to medical staffing procedures, Dr. Ismailoglu testified that he "wasn't involved in the administrative portion of it." J.A. at 664 (Ismailoglu Dep. at 20:3–4). Indeed, Dr. Ismailoglu's deposition testimony reveals not a single instance in which the doctor set or influenced medical policy at the Correctional Facility. By way of comparison, Sheriff Byam testified that, pursuant to his policymaking authority, he had appointed a training coordinator for the Correctional Facility, J.A. at 553 (Byam Dep. at 10:21–22); sought accreditation for the Correctional Facility, J.A. at 556 (Byam Dep. at 13:6–8); requested bids for medical services, J.A. at 556–57 (Byam Dep. at 13:15–14:4); changed medical providers, J.A. at 565 (Byam Dep. at 22:19–21); formulated policy for medical care at the Correctional Facility, J.A. at 567–68 (Byam Dep. at 24:19–25:5); and initiated an investigation into Stanford's death, J.A. at 569 (Byam Dep. at 26:5–8). The record leaves no doubt that *de facto* policymaking authority resided with the sheriff, not with Dr. Ismailoglu.

Accordingly, the record clearly supports the District Court's conclusion that amendment of the Complaint to allege that Dr. Ismailoglu was a "policymaker" would have been futile. We therefore affirm the District Court's denial of Miller's motion for leave to amend the Complaint.

### C.          The District Court Did Not Err in Granting Summary Judgment for Dr. Ismailoglu

On March 6, 2003, the District Court granted summary judgment for Dr. Ismailoglu. In an earlier opinion, the court stated that it was basing its decision on the undisputed facts that "the doctor accepted [Lindsay's] telephone call, listened to a recitation of facts from the facility's personnel, and made a medical judgment to treat the symptoms with [a] course of action that included: observing the decedent; keeping an observation log every thirty minutes; and, examination of the decedent when the medical staff arrived for the morning shift." *Miller v. Calhoun County*, No. 01-245, slip op. at 8 (W.D. Mich. Feb. 11, 2003). The court found no evidence that Dr. Ismailoglu acted

negligently or with deliberate indifference. In addition, the court found no evidence to suggest that Dr. Ismailoglu had provided grossly inadequate medical care, as he had based his medical decision on the facts supplied to him by Lindsay and had not ignored or summarily dismissed the sergeant's inquiries.

Miller now argues that the District Court erred in granting summary judgment for Dr. Ismailoglu. She contends that reasonable minds could differ on whether Dr. Ismailoglu provided any medical care at all, and that the totality of the circumstances support a finding of deliberate indifference. Specifically, Miller notes that Lindsay effectively admitted at deposition that she gave "all the information" to Dr. Ismailoglu, J.A. at 619 (Lindsay Dep. at 23:6), and that a jury could conclude from this admission that the doctor's claims of ignorance are not credible. By extension, according to Miller, a jury could conclude that Dr. Ismailoglu rendered "grossly inadequate care" or was "deliberately indifferent" to Stanford.

Although the Supreme Court in *Farmer* set forth a mixed objective and subjective standard for deliberate indifference, this Court has held that "less flagrant conduct may also constitute deliberate indifference in medical mistreatment cases." *Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 843 (6th Cir. 2001). Thus, a doctor's provision of "grossly inadequate medical care" to an involuntary detainee may amount to deliberate indifference. *Id.* at 844 (citing *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989)). Grossly inadequate medical care is medical care that is "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Id.* To ascertain whether a medical care provider rendered grossly inadequate medical care to a detainee, a court must undertake a "particularized, fact-specific inquiry." *Id.*

Miller notes that Lindsay testified at deposition that the Correctional Facility adhered to a policy whereby the shift supervisor, in the event of a medical emergency, "called the doctor and gave all the information to him." J.A. at 619 (Lindsay Dep. at 23:5–6). Because Lindsay did not admit to having violated this policy, Miller argues, a reasonable jury could infer that Dr. Ismailoglu had all the information necessary for him to conclude that Stanford required immediate hospital care. But Miller's assertions to the contrary, Lindsay's deposition testimony, when viewed in full, hardly amounts to an admission that she provided the doctor with all information that was collectively known by the Corrections Facility staff about Stanford's medical condition in the early morning hours of April 26, 1998. Indeed, Lindsay went on to testify that she could not recall whether she told the doctor that Stanford had suffered a possible seizure, J.A. at 629 (Lindsay Dep. at 27:2–7); that Stanford was unable to walk, J.A. at 629 (Lindsay Dep. at 28:3–5); that Stanford was transported to Intake in a wheelchair, J.A. at 629 (Lindsay Dep. at 28:13–15); or that Stanford needed help remaining in the wheelchair, J.A. at 630 (Lindsay Dep. at 29:3–5). She further could not recall whether she told the doctor that Stanford had reported at the time of booking that he had sustained a head injury one month earlier, in apparent contradiction with his later statement that he had sustained a head injury a year and a half earlier. J.A. at 631 (Lindsay Dep. at 36:13–19). Moreover, at oral argument on Dr. Ismailoglu's motion for summary judgment, Plaintiffs' counsel admitted that there was no direct evidence that Dr. Ismailoglu had been told that Stanford was suffering from a possible seizure. J.A. at 466–67 (Mot. Hr'g Tr. at 23:24–24:5).

When viewed in full, Lindsay's deposition testimony largely comports with Dr. Ismailoglu's general recollection of the phone call he received in the early morning of April 26. Dr. Ismailoglu testified that he recalled Lindsay telling him that this was not an emergency medical situation, that Stanford was conversing normally, and that there was no inappropriate conduct. There does not appear to be any factual inconsistency between Lindsay's and Dr. Ismailoglu's respective versions of the phone call. Miller asks the Court to overlook significant evidence to the contrary and infer from Lindsay's failure to admit to violating County policy that Dr. Ismailoglu must have known all relevant information about Stanford's condition. In making this argument, Miller invites this Court

to engage in speculation to overcome the lack of evidence that Dr. Ismailoglu in fact knew Stanford's true medical condition and chose to ignore a substantial risk of serious harm. We decline the invitation.

In *Terrance*, this Court observed that "[w]hen the need for treatment is obvious, medical care which is so cursory as to amount to no treatment at all may amount to deliberate indifference." 286 F.3d at 843 (internal quotation marks omitted). However, both of the cases that the Court cited for this proposition involved a *known* risk that was disregarded. *See Mandel v. Doe*, 888 F.2d 783, 789 (11th Cir. 1989) (a physician's assistant's failure to inform his superior or a medical doctor of a prisoner's known injured leg constitutes deliberate indifference); *Cooper v. Dyke*, 814 F.2d 941, 945–46 (4th Cir. 1987) (a prison employee's two-hour delay in providing medical care to an inmate known to have gunshot wounds constitutes deliberate indifference). In the instant case, there is simply no evidence that Dr. Ismailoglu knew of the risk posed to Stanford. To the extent Miller argues that Dr. Ismailoglu should have inquired of the details of Stanford's condition, Dr. Ismailoglu testified that "I'm sure I did in that phone conversation. I can't imagine just sitting there and listening to [Lindsay], and then saying, well, have a good night. I'm sure I asked her some questions that satisfied what I wanted to hear and know." J.A. at 670 (Ismailoglu Dep. at 41:15–19). Ultimately, there is no dispute that Dr. Ismailoglu listened to Lindsay's recitation of Stanford's symptoms, advised the sergeant to place Stanford under observation and begin a 30-minute log, and informed Lindsay that the medical staff would examine Stanford in the morning. Miller advances no evidence that Dr. Ismailoglu's medical advice was a grossly inadequate or deliberately indifferent response to the information that Dr. Ismailoglu and Lindsay agree was conveyed.

Because Miller has failed to proffer any evidence that Dr. Ismailoglu in fact knew all relevant information and chose to disregard a substantial risk of serious harm, the District Court did not err in granting summary judgment for Dr. Ismailoglu. We reach this conclusion even in light of the relaxed standard for deliberate indifference set forth in *Terrance*.

**D.      The District Court Did Not Err in Granting Summary Judgment for the Corrections Officer Defendants**

In an Opinion and an Order, both dated September 29, 2003, the District Court granted summary judgment for the Corrections Officer Defendants, finding no evidence that any of these individual defendants had been deliberately indifferent to Stanford's serious medical condition. Miller now appeals that ruling, arguing that the record clearly reflects evidence from which a jury could find deliberate indifference on the part of the Corrections Officer Defendants.

The standard for deliberate indifference, as we have noted, is the mixed objective-subjective standard articulated by the Supreme Court in *Farmer*. There appears to be no dispute among the parties that the objective prong, which requires proof of a "sufficiently serious" medical need, has been satisfied. The Corrections Officer Defendants contend, however, that a substantial risk of serious harm became apparent only after Stanford "was found twitching and showing signs of seizure shortly after 8:00 a.m. on April 26, 1998." Defs.'/Appellees' Br. at 10. Accordingly, this Court need only address the subjective element of the deliberate indifference inquiry.

*1.      Sergeant Michelle Lindsay*

Miller argues that a jury might find that Lindsay had not disclosed "all the information" concerning Stanford's medical condition as she was required to do under County policy. From this starting point, Miller then makes the extraordinary leap of speculating that a jury could find that Lindsay "testified untruthfully during her deposition" and that she "concealed most of the background facts regarding the decedent's head injuries." Miller's Br. at 42. In similar fashion,

Miller conjectures that the initial episode that Stanford experienced in his cell was a seizure, and that he suffered "continued seizures" throughout the night while under observation. *Id.* at 42–43.

In this Circuit, it is established that "[k]nowledge of the asserted serious needs or of circumstances clearly indicating the existence of such needs, is essential to a finding of deliberate indifference." *Blackmore*, 390 F.3d at 896 (citing *Horn*, 22 F.3d at 660); *see also Farmer*, 511 U.S. at 837 ("[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."). When viewed under this standard, the record supports the District Court's conclusion that Miller failed to demonstrate that Lindsay possessed a sufficiently culpable state of mind. There is no dispute that Lindsay lacked actual knowledge of Stanford's true health status. Miller argues instead that Lindsay had knowledge of the circumstances surrounding Stanford's deteriorating condition as they unfolded in the early morning of April 26, 1998, and her failure to take action amounted to deliberate indifference. As the Supreme Court has instructed, however, Lindsay would have had to draw the inference that a substantial risk of serious harm existed before a jury could be permitted to consider whether her failure to act amounted to deliberate indifference. Miller has produced no evidence that Lindsay drew such an inference.

Indeed, the record contains numerous instances of uncontroverted evidence tending to show that at no time during her shift did Lindsay infer the existence of a substantial risk of serious harm. Upon arriving at Stanford's cell, Lindsay questioned Stanford and found him to be responsive. He indicated that he had not hit his head when he fell. Lindsay checked Stanford's pulse and found it to be "strong and steady." J.A. at 284. Although Stanford's cellmate expressed an opinion that Stanford had suffered a possible seizure, Lindsay observed no seizure activity. She ascertained that Stanford's pupils were dilated, but equally so. The deputies, under Lindsay's direction, transported Stanford to Intake, and Lindsay promptly consulted the on-call physician. Following the doctor's advice, Lindsay placed Stanford under 30-minute observation to monitor him for a change in condition. At one point, in response to Stanford's suggestion that low blood sugar might be causing his headache, Lindsay administered a blood sugar test and found Stanford's blood sugar to be within normal range. Lindsay also inquired whether Stanford had taken any drugs, and when he had had his last drink. Despite "rolling around on floor" for much of the night, Stanford was coherent when spoken to and appeared "O.K." during the 7:30 a.m. and 8:00 a.m observations. J.A. at 288–89, 291, 741. Even with the benefit of hindsight, Dr. Ismailoglu testified that Stanford's seizure at 8:10 a.m on April 26, 1998 was "the first concrete evidence that there was a neurological disorder going on." J.A. at 674 (Ismailoglu Dep. at 60:22–24). In short, nothing in this record supports the conclusion that Lindsay had inferred the existence of a substantial risk of serious harm.

With respect to Lindsay's phone call to Dr. Ismailoglu, the record does support a conclusion that the sergeant may have failed to relate all relevant information concerning Stanford's condition. There is no evidence, however, that Lindsay's omissions were deliberate. *See Estelle*, 429 U.S. at 106 (holding that prisoner must allege acts or omissions evidencing deliberate indifference to serious medical needs). Accordingly, while the record might support a conclusion that Lindsay was negligent in failing to inform the doctor of all relevant facts, there is no support for a finding that such failure rose to the level of a constitutional violation. *See Farmer*, 511 U.S. at 838 ("[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.").

For the reasons discussed, we find that the record fully supports the District Court's grant of summary judgment for Lindsay.

### 2.      *Remaining Corrections Officer Defendants*

The remaining Corrections Officer Defendants consist of the individual deputies who interacted with and observed Stanford on the morning of April 26 and Leavell, the shift commander who relieved Lindsay and who discovered Stanford having an apparent seizure at 8:10 a.m. In an argument confined to a single paragraph, Miller contends that these defendants witnessed Stanford's condition when they found him on the floor of his cell, they knew Stanford was not receiving medical care, and they watched as Stanford rolled on the floor of the observation cell for six hours. Because Miller's argument does not differentiate among these defendants, this Court will address their potential § 1983 liability collectively.

There is no evidence that any of these defendants acted with a sufficiently culpable mental state necessary to confer liability under § 1983. The deputies who initially responded to Stanford's cell at 12:30 a.m. knew that Lindsay subsequently consulted Dr. Ismailoglu, who advised placing Stanford under observation. Stanford's mattress was directly on the floor of the observation cell, and Byam testified that "rolling around on the mattress probably was not uncommon to be observed by the corrections officers." J.A. at 574 (Byam Dep. at 31:21–23). Several deputies reported that Stanford was responsive and coherent when spoken to, and Lindsay testified that she observed Stanford standing at least once. On one occasion, Stanford asked Holley for a snack and suggested that low blood sugar might be the cause of his headache. The record reflects that the deputy promptly reported this request to Lindsay, and that the corrections officers administered a blood sugar test and ascertained that Stanford's blood sugar was within normal range. Stanford's condition neither worsened nor improved throughout the night. There appears to be no dispute that Leavell promptly summoned medical assistance when she observed Stanford having an apparent seizure. In short, nothing in the record indicates that the remaining Corrections Officer Defendants possessed "deliberateness tantamount to intent to punish." *Horn*, 22 F.3d at 660. Accordingly, the record fully supports the District Court's grant of summary judgment for the remaining Corrections Officer Defendants.

## III. CONCLUSION

For the foregoing reasons, we find that Miller has failed to adduce evidence demonstrating that any of the Defendants acted with a sufficiently culpable mental state to establish deliberate indifference. We further find that the District Court did not err in denying Miller's motion for leave to amend the Complaint on the ground that the proposed amendment would be futile. Accordingly, we **AFFIRM** the District Court's adjudication of this matter in all respects.