NOT RECOMMENDED FOR PUBLICATION
File Name: 19a0168n.06

No. 18-3172

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

<table>
<tr><td>

DAVID O. COOPER,

    Plaintiff-Appellant,

v.

MONTGOMERY COUNTY, OHIO SHERIFF'S DEPARTMENT; LIEUTENANT MONTGOMERY COUNTY, OHIO SHERIFF'S DEPARTMENT, Second Shift; MONTGOMERY COUNTY, OHIO SHERIFF'S DEPARTMENT, Doe Deputies All Sued in their Official and Individual Capacities; MAJOR DARYL WILSON; MONTGOMERY COUNTY, OHIO; CAPTAIN CHUCK CROSBY,

    Defendants-Appellees,

</td><td>

)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)

</td><td>

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO

</td></tr>
</table>

**BEFORE: CLAY, McKEAGUE, and WHITE, Circuit Judges.**

**HELENE N. WHITE, Circuit Judge.**

Plaintiff-Appellant David Cooper was a pretrial detainee at Montgomery County Jail for approximately eight months in 2012. After Cooper attempted to harm himself several times, Cooper was housed in the receiving area of the jail for several months with no mattress, no blanket, constant lighting, and frequent loud noises. As a result, Cooper alleges that Defendants-Appellees were deliberately indifferent to his serious psychiatric needs and provided him with unconstitutional conditions of confinement. The district court granted summary judgment in favor of Defendants-Appellees Captain Chuck Crosby (Captain Crosby) and Major Daryl Wilson (Major

FILED
Apr 02, 2019
DEBORAH S. HUNT, Clerk

Wilson), granted summary judgment in favor of Defendant-Appellee Montgomery County on Cooper's psychiatric-needs claim, but denied summary judgment on Cooper's conditions-of-confinement claim against the County. After a jury verdict in favor of the County on Cooper's conditions-of-confinement claim, Cooper now appeals the district court's summary judgment rulings against him. We affirm.

## I.[1]

Cooper has a long history of mental-health disorders. He was diagnosed with ADHD at age 6; borderline personality disorder and schizoaffective disorder around age 13; and as bipolar manic sometime later. He had been cutting himself since he was 12 or 13 years old and engaging in other self-harming behavior since he was around 5 years old.

Cooper arrived at Montgomery County Jail on February 29, 2012, as a pretrial detainee facing robbery and other charges. Upon arrival, he was given a mental-health assessment and placed in the general jail population where he had a bunk bed. Another detainee "got in trouble with his meds so they cut everybody off in [Cooper's] little pod, off of certain psych meds that were in there because guys were abusing them." (R. 104, PID 469.)[2] Cooper did not respond well. On June 6, 2012, Cooper was sent to the hospital after he used a spoon to severely cut his arm and swallowed a large bolt. He returned to the Montgomery County Jail and was placed in the receiving area of the jail, with corrections officers constantly in the general area to monitor him. The receiving area was loud, bright lights were always on, and Cooper was not provided a bed, mattress, or blankets. He had to sleep either on the concrete floor—freezing cold from air

---

[1] In considering Defendants' motion for summary judgment, the district court was required to view the evidence and draw all reasonable factual inferences in Cooper's favor. Accordingly, we recite Cooper's version of the facts, except where otherwise noted.

[2] Although it is not clear when, Cooper was eventually provided medication for his mental-health issues and does not assert a claim for being deprived of medication.

conditioning being blown on it—or the toilet. He was "so miserable" that "sometimes [he] would just [harm himself] to be able to . . . go out to the hospital, get some rest . . . because it was so bad [he] couldn't sleep." (*Id.* at PID 477.)

Cooper thus continued to harm himself. On June 11, Cooper pulled out his stitches and stuck a piece of metal in his arm. On June 27, Cooper cut himself with a plastic cup. On July 17, Cooper removed and ingested the stitches or staples in his arm. On July 30, Cooper claimed to have swallowed a toothbrush, and on August 8, he swallowed paper clips. He also attempted to eat his mattress and lodged a piece of plastic in his urethra. On at least two occasions, Cooper was sent to Summit Behavioral Health in Cincinnati before being returned to Montgomery County Jail.

Cooper informed corrections officers that he was hearing voices and wanted to hurt himself. He also repeatedly asked for a mattress so that he could sleep. In particular, Cooper spoke with Major Wilson and Captain Crosby frequently about the lack of a mattress, as well as the food he was being served. Captain Crosby is the administrative captain of the jail, whose office is near the receiving area where Cooper was held; Major Wilson, who was often in Captain Crosby's office, was the highest-ranking sheriff's department official at the jail. Captain Crosby and Major Wilson declined to provide a mattress, claiming that they needed to talk to mental-health professionals about the issue.

On June 27, Cooper's mother, Kathy Cooper, wrote a letter to Montgomery County Sheriff Phil Plummer, complaining that the jail failed to take the necessary precaution of making sure Cooper did not have access to materials he could use to harm himself. Ms. Cooper also had numerous conversations with Captain Crosby about the unsafe conditions of Cooper's confinement, including the lack of a mattress and a blanket, Cooper's diet, and the access Cooper had to materials he could use to harm himself. On at least one occasion, mental-health staff and

Major Wilson were also present. They assured Ms. Cooper that Cooper was given medical treatment when necessary, but admitted that they did not know how to deal with someone like Cooper: "They are not equipped to handle him is what Captain Crosby said. They are just a detainee facility . . . ." (R. 113 at 25-26.)

Captain Crosby acknowledged that Cooper was an "extraordinary inmate" and they "had [their] hands full" with him. (R. 116, PID 1048, 1067.) Captain Crosby explained that he was communicating frequently with Samaritan Behavioral Health and his supervisors because he had never experienced an inmate like Cooper before, and he relied heavily on Samaritan Behavioral Health and NaphCare, contractors who provide medical services in the jail. Captain Crosby remembers discussing a suicide mattress—a tear-resistant mattress—with Major Wilson, but he does not remember if the facility purchased one for Cooper. Major Wilson testified that Cooper challenged corrections officers to obtain a suicide mattress and that he had conversations with staff about obtaining one, although he believed that they did not have a suicide mattress at the time. Major Wilson testified that the decision to take a mattress from an inmate is based on consultation with medical staff. He also noted that Cooper complained about the lack of a mattress, but that removing the mattress from him was necessary because "he would use anything he could to harm himself." (R. 118 at 75.)

Jail records from July and August document that Cooper consistently asked for a mattress, threatening to harm himself if he did not get one, and was sometimes incoherent, potentially from lack of sleep. Jail personnel responded that Cooper had "to prove that he will not harm himself." (R. 116-5, PID 1093.) And entries from a Samaritan Behavioral Health employee state that Cooper must "demonstrate [he is] able to maintain safety" to "earn a mat," and the employee consistently

reiterates, per her supervisor, the restriction that Cooper is not to have a mattress or blanket. (*See, e.g.*, *id.* at PID 1105-06.)

On August 15, Dr. Leland Johansen, a psychiatrist for Naphcare, sent an email to Captain Crosby and others about Cooper. After giving a brief overview of borderline personality disorder[3] and Cooper's self-harming behaviors, Dr. Johansen stressed that "[a] jail[] is not the appropriate setting for [Cooper's] treatment, much less reasonable appropriate safe management. [Cooper] is in need of constant, 1:1 supervision and short of this, will continue to injure self and I fear inadvertently kill[] himself." (R. 116-2, PID 1085.) Captain Crosby testified that all this email did "was let me know that we had our hands full." (R. 105, PID 574.) And, as the district court noted, "[i]t does not appear that any action was taken in response to Dr. Johansen's letter." (R. 123, PID 1335.)

On August 15, Ms. Cooper wrote an email to corrections officers complaining about Cooper's poor diet and sleeping conditions, noting that Cooper was harming himself "just to go to the hospital and get REST on a bed and NUTRITIONAL FOOD in his body." (R. 112-1, PID

---

[3] Dr. Johansen explained borderline personality disorder as follows:

> In brief the diagnosis presents itself as a pervasive pattern of instability of interpersonal relationships, self-image, and affects, and a marked impulsivity beginning in early adulthood and presenting in a variety of contexts. One of the main driving forces is anxiety and the need to alleviate it at any cost. This patient, as with most other patient[s] with BPD, by bringing pain to them, reestablishing a sense of reality, being and decreasing the anxiety; the main focus of pattern seen as self destructive and or suicidal gestures and attempts. Killing themselves is not the goal, but is frequently the outcome of poorly planned, impulsive behaviour. One of the results of this behaviour is a "splitting" of caregivers into two camps; anger and empathy, and disruption of the treatment model and the patient is sometimes lost in a unified plan (ex; Dad can I borrow the car? NO!....Mom can I borrow the car? Sure. Parents fight and child gets the care (sic)). Individuals with this BPD also are extremely sensitive to the ways others treat them, with no respect to their part in the reaction. Their reation (sic) is almost always strong with a perceived sense of criticism and hurtfulness. In response their manipulation and acting out increases. I (sic) a jail setting, the normal day to day treatment of IMs results in this reaction amplified, raising the ante on bad behaviour toward them. These patients tend to be hyper-alert to others (sic) reactions and emotions, and play off them with great manipulative effectiveness. There is more to this disorder but leave this to suffice for an introduction to our patient . . . .

(R. 116-2, PID 1085.)

965.) Major Wilson responded to this email, noting that "we are doing everything we can," though acknowledging that, "due to our county jail facility not [being] designed for long-term, extensive psychiatric care for inmates like David (unstable mental state and self abuse), he continues to be a very unique pretrial detainee for us to manage." (R. 109-1, PID 901.) On August 17, Ms. Cooper sent an email regarding how loss of sleep affects one's mental state and requested that Cooper be provided a mattress.

In late-September 2012, Ms. Cooper contacted Gregory Dann and Gary Craft, State Jail Inspectors, concerning Cooper's lack of a mattress. Craft told Ms. Cooper that "they haven't listened to you, but they will by God listen to me because what they are doing is against the law." (R. 113 at 37.) Cooper was then quickly provided with a mattress, possibly a suicide mattress. When Dann emailed Major Wilson about the lack of a mattress, Major Wilson explained that Cooper had used any means to harm himself and the mattress and blanket were taken for his own protection. Major Wilson also noted that, "for several months, inmate Cooper's self-harming behavior has improved (due to daily medications) and he is NOW allowed to have a mattress and blanket in his suicide housing cell 24 hours a day." (R. 112-1, PID 962.) There is no evidence that Cooper attempted to harm himself again in the Montgomery County Jail after receiving the mattress. Approximately one month after being provided with the mattress, he was transferred from the Montgomery County Jail after being sentenced to prison.

In August 2013, Cooper filed this lawsuit. All his claims and all defendants were dismissed except his § 1983 claims against Montgomery County, Captain Crosby, and Major Wilson for deliberate indifference to serious psychiatric needs and unconstitutional conditions of confinement. The district court then granted summary judgment in favor of Captain Crosby and Major Wilson on the claims brought against them in their official capacities, explaining that those

claims were duplicative of the claims against Montgomery County. The district court also granted summary judgment in favor of Defendants on the psychiatric-needs claim, finding that Cooper had not met his burden to establish a constitutional violation. The district court reasoned that Captain Crosby and Major Wilson regularly consulted with mental-health professionals and followed their recommendations; that Cooper met with mental-health professionals on a regular basis; and that, even assuming Defendants made no attempt to relocate Cooper after Dr. Johansen's letter—which was the first recommendation by a mental-health professional that Cooper should be relocated— there was no evidence that Cooper had harmed himself after that letter was sent.

Regarding the conditions-of-confinement claim, the district court determined that there was a genuine dispute of material fact about whether Montgomery County violated Cooper's constitutional right by depriving him of a mattress[4] and whether Montgomery County had an unwritten policy, custom or practice of withholding mattresses from suicidal inmates. The district court thus denied Montgomery County's motion for summary judgment on that claim. However, the district court granted summary judgment in favor of Captain Crosby and Major Wilson on qualified-immunity grounds, finding that the right of a suicidal inmate not to be deprived of a mattress for several consecutive months was not clearly established.

After a jury trial in which Cooper focused extensively on Captain Crosby and Major Wilson's actions and called both as witnesses in his case-in-chief, the jury found in favor of Montgomery County on Cooper's conditions-of-confinement claim. Specifically, the jury answered "No" to a special interrogatory asking whether Cooper had proven by a preponderance of the evidence "that one or more Montgomery County Sheriff's Office employees violated his Fourteenth Amendment due process rights by depriving him of the minimal civilized measure of

---

[4] The district court rejected Cooper's claim based on his diet—which he said consisted for months of only bologna sandwiches and cookies—finding no constitutional violation. Cooper does not raise this issue on appeal.

life's necessities, and by being deliberately indifferent to the conditions of confinement about which he complained." (R. 163, PID 1548.)

Cooper appeals, challenging the district court's grant of summary judgment to Captain Crosby and Major Wilson on both claims, and the grant of summary judgment in favor of Montgomery County on Cooper's psychiatric-needs claim. After oral argument, we requested supplemental briefing asking the parties to analyze the preclusive effect, if any, of the jury verdict entered in favor of Montgomery County on Cooper's conditions-of-confinement claim. Cooper's supplemental letter briefs appear to argue only that the jury verdict has no preclusive effect on his psychiatric-needs claim, as he concludes his briefing by "request[ing] that the trial court's grant of qualified immunity on the issue regarding Plaintiff-Appellant's psychiatric needs be reversed and remanded." (ECF No. 41, Suppl. Reply Letter Br. at 2-3.) Cooper thus appears to concede that the jury's finding of no unconstitutional conditions of confinement means that the district court's grant of qualified immunity to Captain Crosby and Major Wilson on that claim is no longer a live issue in this appeal. *See Sell v. City of Columbus*, 127 F. App'x 754, 763-64 (6th Cir. 2005) (finding harmless error where district court erroneously granted qualified immunity to individual defendants but a jury ultimately returned a verdict for the city, establishing that the plaintiffs' constitutional rights were not violated); *see also Sallenger v. City of Springfield*, 630 F.3d 499, 504-05 (7th Cir. 2010); *Dehne v. City of Reno*, 222 F. App'x 560, 562 (9th Cir. 2007); *Monfils v. Taylor*, 165 F.3d 511, 518-21 (7th Cir. 1998).

Accordingly, we address only Cooper's psychiatric-needs claim.

**II.**

**A. Standard of Review**

This court reviews de novo a denial or grant of summary judgment, including based on qualified immunity, viewing all evidence and drawing all reasonable inferences in the light most favorable to the non-moving party. *See Kent v. Oakland County*, 810 F.3d 384, 390 (6th Cir. 2016) (citations omitted). Summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a).

Cooper seeks damages under 42 U.S.C. § 1983 for deliberate indifference to serious psychiatric needs. "In the specific context of a § 1983 action, the non-moving party must demonstrate a genuine issue of material fact as to the following two elements: 1) the deprivation of a right secured by the Constitution or laws of the United States and 2) [that] the deprivation was caused by a person acting under color of state law." *Miller v. Calhoun County*, 408 F.3d 803, 811-12 (6th Cir. 2005) (alteration in original) (internal quotation marks omitted) (quoting *Johnson v. Karnes*, 398 F.3d 868, 873 (6th Cir. 2005)). There is no dispute that Montgomery County, Captain Crosby, and Major Wilson were acting under color of state law.

Because Cooper was a pretrial detainee during the time in question, the Eighth Amendment does not apply to him. *Watkins v. City of Battle Creek*, 273 F.3d 682, 685 (6th Cir. 2001). Rather, his claims are governed by the Fourteenth Amendment's substantive due process clause, although this court has generally applied the same standard under that clause as it does for a challenge under the Eighth Amendment. *See id.* at 685-86; *see also Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013) ("Pretrial detainee claims, though they sound in the Due Process Clause

of the Fourteenth Amendment rather than the Eighth Amendment, are analyzed under the same rubric as Eighth Amendment claims brought by prisoners." (citations omitted)).

Captain Crosby and Major Wilson argue that they are protected by qualified immunity. "The qualified immunity doctrine protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Goodwin v. City of Painesville*, 781 F.3d 314, 320–21 (6th Cir. 2015) (internal quotation marks omitted) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). In determining whether a right is clearly established, the Supreme Court has cautioned courts "not to define clearly established law at a high level of generality." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (internal quotation marks and citation omitted). "Although [the Supreme] Court's caselaw does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (internal quotation marks and citation omitted).

## B. Deliberate Indifference to Serious Psychiatric Needs

In order to succeed on his psychiatric-needs claim, Cooper must show that: (1) he had a serious psychiatric need; (2) Defendants knew about it; and (3) they were deliberately indifferent to it. *Perez v. Oakland County*, 466 F.3d 416, 423-24 (6th Cir. 2006). The only issue in dispute is whether Defendants were deliberately indifferent.

> "Deliberate indifference" as analyzed by this court has both an objective and a subjective component. *See Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001). In cases involving an inmate's medical needs, the need "must be, objectively, 'sufficiently serious.'" *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S. Ct. 1970, 128 L.Ed.2d 811 (1994) (citing *Wilson v. Seiter*, 501 U.S. 294, 298, 111 S. Ct. 2321, 115 L.Ed.2d 271 (1991)). In considering the subjective component, this circuit has emphasized that a plaintiff must produce evidence showing "that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Comstock*, 273 F.3d at 703. The subjective component requires that an

> official who actually knew of the serious medical need possessed "a sufficiently culpable state of mind in denying medical care." *Miller v. Calhoun County*, 408 F.3d 803, 813 (6th Cir. 2005) (quoting *Farmer*, 511 U.S. at 834, 114 S. Ct. 1970). "Deliberate indifference requires a degree of culpability greater than mere negligence, but less than 'acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'" *Id.* at 813, 114 S. Ct. 1970 (quoting *Farmer*, 511 U.S. at 835, 114 S. Ct. 1970). The Supreme Court has also said, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838, 114 S.Ct. 1970.

*Id.*

Cooper argues that Captain Crosby and Major Wilson were deliberately indifferent to his serious psychiatric needs by not providing him a mattress. In dismissing this claim, the district court relied heavily on the fact that Major Wilson and Captain Crosby both testified—and jail notes support—that they followed the advice of medical and mental-health professionals in their treatment of Cooper's psychiatric needs.

Indeed, Cooper did not suffer from lack of attention by medical and mental-health staff. He was given a mental-health assessment upon his arrival and had regular interactions with mental-health personnel. He was sent to Summit Behavioral Health twice, but was returned in short order both times because of Summit's determination that he had a behavioral problem rather than a serious mental illness. When Cooper injured himself, he was sent to the hospital. The record reflects that Cooper was generally provided medication for his mental-health issues, and he does not complain that his medication was inadequate. In every jail record, the overriding concern of mental-health professionals was the potential that Cooper would commit suicide or engage in other self-harming behaviors. The same is true of Dr. Johansen's letter. Dr. Johansen did not recommend that Cooper be provided a mattress or get better sleep to treat his psychiatric needs; rather, he attributed Cooper's behavior to borderline personality disorder and opined that a jail was not an appropriate setting because jail officials could not adequately protect Cooper from himself.

Not being mental-health professionals, Captain Crosby and Major Wilson appeared to make it their priority that Cooper not have access to any materials that he could use to harm himself, including, at the direction of mental-health professionals, a mattress. Under these circumstances, Captain Crosby and Major Wilson were not deliberately indifferent to Cooper's serious psychiatric needs by not providing him a mattress. *See, e.g.*, *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008) ("Defendant officers, however, contend that they were not deliberately indifferent to Jones' medical needs because they reasonably responded to Jones' requests for medical attention in a timely manner. In particular, Defendant officers argue that they were entitled to rely upon the medical treatment of CMS nurses once they obtained medical care for Jones. Therefore, Defendant officers argue, the district court erroneously denied qualified immunity. We agree."); *see also Westlake v. Lucas*, 537, F.2d 857, 860 n.5 (6th Cir. 1976) ("Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law.").

Further, it is well-established that if a prisoner shows "a strong likelihood that he would attempt to take his own life," failure to take adequate precautions can amount to deliberate indifference to the prisoner's serious medical needs. *Barber v. City of Salem*, 953 F.2d 232, 240 (6th Cir. 1992). Accordingly, it was reasonable for Captain Crosby and Major Wilson to make suicide prevention their top priority, consistent with the direction of medical staff.

Cooper rightly points out that the solution here was simple: supply Cooper with a suicide mattress, which Defendants were able to obtain shortly after Ms. Cooper elevated her complaints to the State Jail Inspectors. But this argument does not fit neatly into an analysis of deliberate indifference to serious psychiatric needs because providing a mattress is not generally thought of

as medical care and there is no evidence that a mattress was ever discussed in the context of treating Cooper's psychiatric needs.  *See Villegas*, 709 F.3d at 569-70 (explaining that a claim by a pregnant detainee for shackling during childbirth did not fit into the typical medical-needs fact patterns, i.e., where a detainee is deprived of medical care or where officials interfere with a prescribed treatment plan).  Rather, Cooper's claim is more appropriately considered a conditions-of-confinement claim, *see, e.g.*, *Chappell v. Mandeville*, 706 F.3d 1052, 1060-61 (9th Cir. 2013) (analyzing claim based on mattress deprivation as a conditions-of-confinement case); *Jones v. Toombs*, 77 F.3d 482 (6th Cir. 1996) (unpublished) (finding no unconstitutional conditions of confinement where inmate was deprived of a mattress for a two-week period, and rejecting medical-needs claim because the officers "did not intentionally deny or delay access to medical care or intentionally interfere with any treatment"), which Cooper brought against Defendants but lost at trial.[5]

As to the County's liability, because Captain Crosby and Major Wilson were not deliberately indifferent to Cooper's serious psychiatric needs, summary judgment in favor of the County was also warranted because Cooper does not purport to base the County's liability on the actions of anyone other than Captain Crosby and Major Wilson.

**III.**

For the reasons set out above, we affirm.

---

[5] Our conclusion is reinforced by Cooper's own briefing on appeal where, although he has a section heading purporting to address deliberate indifference to serious psychiatric needs, the majority of the discussion and cases cited in that section relate to conditions of confinement.