RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 19a0204p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

LOGAN VANDERHOEF,

*Plaintiff-Appellant*,

*v.*

MAURICE KELLY DIXON,

*Defendant-Appellee*.

No. 18-5993

───────────────

Appeal from the United States District Court
for the Eastern District of Tennessee at Knoxville.
No. 3:16-cv-00508—Thomas A. Varlan, Chief District Judge.

Decided and Filed:  August 21, 2019

Before:  GUY, CLAY, and GRIFFIN, Circuit Judges.

───────────────

## COUNSEL

**ON BRIEF:**  Van R. Irion, LAW OFFICE OF VAN R. IRION, Knoxville, Tennessee, for Appellant.   Matthew J. Evans, Lindsey M. Collins, PAINE BICKERS LLP, Knoxville, Tennessee, for Appellee.

───────────────

## OPINION

───────────────

GRIFFIN, Circuit Judge.

Plaintiff Logan Vanderhoef crashed his Ford Mustang into defendant Maurice Dixon's vehicle.  Dixon, an off-duty, part-time reserve police officer, responded by holding Vanderhoef and his passengers at gunpoint for about two minutes.  A jury found that by doing so, Dixon violated Vanderhoef's Fourth Amendment rights.  But the district court set aside the jury's

verdict, ruling that Dixon was entitled to qualified immunity because no clearly established law put him on notice that doing what he did was unconstitutional. We disagree and reverse.

I.

This suit arises out of an auto accident and subsequent confrontation between plaintiff Logan Vanderhoef and defendant Maurice Dixon in May of 2016. Defendant, a part-time reserve officer with the City of Maryville, Tennessee, Police Department, was off duty and driving home in his personal vehicle. It was daytime and defendant saw plaintiff's Ford Mustang driving towards him at a high rate of speed. Plaintiff, with two passengers in the car, came around a curve going too fast and swerved into the oncoming lane of traffic, where defendant was driving. Plaintiff then swerved past the oncoming-traffic lane, into the ditch on the side of the road, and struck a telephone pole before swerving back across the road and hitting defendant's front fender. After the collision, both cars came to a stop approximately 120 feet apart.

Defendant got out of his vehicle holding his personal handgun and approached plaintiff's car in a hurry.[1] The Mustang's airbags had deployed in the collision, and all three occupants were trying to exit the vehicle as defendant approached. With his gun drawn, defendant began directing the three teenagers out of the car by repeatedly yelling, "Let me see your hands, get on the ground." Defendant pointed the gun at plaintiff's head the whole time he was giving these orders. All three teenage occupants of the car complied and got on the ground outside the vehicle. Dixon held them at gunpoint for roughly two minutes.

A third-party witness, Martha Keller, saw everything. Once defendant began ordering the teenagers to the ground and pointing his gun at plaintiff, she quickly intervened. She got out of her car and told defendant "[y]ou need to calm down. You need to put that gun away." He responded, "Shut up, mind your own business, and get back in your car." When Keller threatened to call the police, defendant reholstered his gun and told her that he was a police

---

[1]Defendant testified that his gun was not drawn when he exited his vehicle but, given the posture of this case, we must give credence to all evidence favoring plaintiff, *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000), and take all disputed facts in the light most favorable to plaintiff, *Walker v. Davis*, 649 F.3d 502, 503 (6th Cir. 2011).

officer; Keller called anyway.  And after defendant and Keller finished speaking, defendant told plaintiff and his passengers that they could get up and plaintiff could call his mother.  While Keller was on the phone with police, defendant returned to his car, put his gun away, retrieved his badge, and showed it to Keller.

Plaintiff filed this federal lawsuit against defendant, alleging deprivation of his rights under 42 U.S.C. § 1983 and assault and false imprisonment under Tennessee law.  The case went to trial.  At the conclusion of plaintiff's case in chief, defendant moved for a directed verdict on qualified-immunity grounds.  The district court took that motion under advisement.

The jury found in plaintiff's favor and awarded him $500 for each of his three claims.  After trial, defendant renewed his claim for qualified immunity in a motion for judgment as a matter of law.[2]  The district court granted the motion on qualified-immunity grounds and dismissed all three claims.  The court concluded that defendant violated plaintiff's constitutional rights but that the law was not clearly established to put defendant on notice that his conduct was unlawful.  Accordingly, it entered judgment in defendant's favor.  Plaintiff Vanderhoef now appeals.

## II.

We review de novo a district court's decision to grant a renewed motion for judgment as a matter of law, drawing all reasonable inferences in favor of the nonmoving party.  *McKenna v. Edgell*, 617 F.3d 432, 437 (6th Cir. 2010).  We review all evidence in the trial record, "giv[ing] credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000).  And the same is true when the underlying question is qualified immunity, which requires us to review all evidence in the light most favorable to the plaintiff.  *Champion v. Outlook Nashville,*

---

[2]Below, defendant primarily argued that he was not acting "under color of" law during the post-accident confrontation because he was off duty and merely acting as a private citizen.  *See* 42 U.S.C. § 1983 ("Every person who, *under color of* any statute, ordinance, regulation, custom, or usage, of any State or Territory . . . ." (emphasis added)).  But the district court rejected this argument, and defendant has not challenged that aspect of the district court's opinion on appeal.

*Inc.*, 380 F.3d 893, 900 (6th Cir. 2004). "After trial, if defendants continue to urge qualified immunity, the decisive question, ordinarily, is whether the evidence favoring the party seeking relief is legally sufficient to overcome the defense." *Ortiz v. Jordan*, 562 U.S. 180, 184 (2011). At this stage, the defense of qualified immunity is "evaluated in light of the character and quality of the evidence received in court." *Id.*; *see also* 15A C. Wright, A. Miller, & E. Cooper, Federal Practice & Procedure § 3914.10 (2d ed. 1992) ("[O]nce trial has been had the availability of official immunity should be determined by the trial record, not the pleadings nor the summary judgment record.").

## III.

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). It "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id*. The qualified-immunity analysis comprises two separate but related inquiries: "(1) taken in the light most favorable to the party asserting the injury, do the facts . . . show the officer's conduct violated a constitutional right, and (2) was the right clearly established to the extent that a reasonable person in the officer's position would know that the conduct complained of was unlawful." *Bletz v. Gribble*, 641 F.3d 743, 750 (6th Cir. 2011) (brackets and internal quotation marks omitted). We address each step in turn.

## A.

First we must decide whether the facts presented at trial adequately established a violation of plaintiff's constitutional rights to be free from excessive force and unreasonable seizure under the Fourth Amendment. We conclude that they did.

The Fourth Amendment protects the citizenry, as well as noncitizens, "against unreasonable searches and seizures." U.S. Const. amend. IV; *see Almeida-Sanchez v. United States*, 413 U.S. 266 (1973). An officer's use of excessive force violates the Fourth Amendment.

*Binay v. Bettendorf*, 601 F.3d 640, 647 (6th Cir. 2010). To determine whether an excessive-force violation has occurred, we apply "the objective-reasonableness standard, which depends on the facts and circumstances of each case viewed from the perspective of a reasonable officer on the scene and not with 20/20 hindsight." *Fox v. DeSoto*, 489 F.3d 227, 236 (6th Cir. 2007). Analyzing whether force was excessive involves balancing "'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Muehler v. Mena*, 544 U.S. 93, 108 (2005) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97. "Relevant considerations in determining the reasonableness of force used are: 1) the severity of the crime at issue; 2) whether the suspect posed an immediate threat to the safety of the police officers or others; and 3) whether the suspect actively resisted arrest or attempted to evade arrest by flight." *Harris v. City of Circleville*, 583 F.3d 356, 365 (6th Cir. 2009). These factors are not exhaustive, and our inquiry remains whether the totality of the circumstances justified defendant's particular seizure of plaintiff. *See Smoak v. Hall*, 460 F.3d 768, 783 (6th Cir. 2006). "In determining whether a Fourth Amendment violation occurred, we draw all reasonable factual inferences in favor of the jury verdict, but . . . we do not defer to the jury's legal conclusion that those facts violate the Constitution." *Mena*, 544 U.S. at 98 n.1. Looking to these considerations, we conclude that defendant was unreasonable in pointing his gun at plaintiff's head and holding him at gunpoint for approximately two minutes.

With respect to "the nature and quality of the intrusion on [plaintiff's] Fourth Amendment interests," *Graham*, 490 U.S. at 396, defendant's actions were extreme. Defendant—despite being off duty, out of uniform, and never having identified himself as a police officer—kept his gun trained at plaintiff's head while issuing orders to plaintiff. We have recognized that "pointing a firearm at an individual and making a demand of that individual . . . communicates the implicit threat that if the individual does not comply with the [] demands, the [one pointing the firearm] will shoot the individual." *United States v. Bolden*, 479 F.3d 455, 461 (6th Cir. 2007); *see generally Binay*, 601 F.3d at 650 (recognizing that pointing a gun at an

individual can constitute excessive force under the Fourth Amendment, as can unreasonably detaining an individual at gunpoint).  Defendant's actions amounted to a credible threat of deadly force by an individual who, to all outside appearances, was a civilian, and defendant's threat remained in effect for the roughly two minutes he kept his gun pointed at plaintiff's head.

Turning to the factors recited in *Harris*, first, "the severity of the crime at issue," 583 F.3d at 365, weighs in plaintiff's favor.  Conduct that is not a violent or serious crime does not permit an officer to use increased force absent other factors.  *Goodwin v. City of Painesville*, 781 F.3d 314, 322 (6th Cir. 2015).  Here, defendant was aware of only some reckless driving by plaintiff.  And at trial, defense counsel also elicited testimony that plaintiff was driving with two minor passengers (in violation of his Ohio restricted-license requirements as a sixteen-year-old) and without a seatbelt (contrary to Ohio traffic law).  Defendant could not have known of these license and seatbelt violations at the time, but even taking all these violations together they amount to nothing more than traffic offenses—citations which commonly fall within the lowest rung of unlawful activity. *See Harris*, 583 F.3d at 366 ("[The plaintiff] was accused of 'speeding, DUI and failing to appear in mayor's court.'  Relatively speaking, these are not particularly serious crimes and none of them involve violence.").  Though defendant testified that when he approached the vehicle he believed it might have been stolen, this purported belief was not based on any facts in the record.  Neither the jury nor this court is required to accredit it.  Thus, this consideration weighs in plaintiff's favor.

Second, "whether the suspect posed an immediate threat to the safety of the police officers or others," *Harris*, 583 F.3d at 365, favors plaintiff.  As defendant testified, when he exited his truck with his gun drawn, he had "observed reckless driving but there still wasn't a reason to draw [his] weapon," and there "was no threat towards" defendant at that time.  It was only once defendant arrived within a few feet of the Mustang that he thought the passengers might have been a threat to his safety.  But his subjective beliefs do not make it so.  Instead, defendant approached a car immediately after a relatively serious car accident and saw three passengers trying to exit the wreckage.  The back window of the Mustang shattered in the accident, and the backseat, with one of plaintiff's passengers inside, was readily visible.  And the jury also heard testimony that plaintiff's front-seat passenger never reached back into the vehicle

and was plainly visible at all times. Taking the evidence presented at trial in the light most favorable to plaintiff, as we must, *Champion*, 380 F.3d at 900, neither plaintiff nor his passengers posed any viable threat to defendant's safety.

Third, "whether the suspect actively resisted arrest or attempted to evade arrest by flight," *Harris*, 583 F.3d at 365, also weighs in plaintiff's favor. There is no evidence that plaintiff and his passengers did anything but comply completely with defendant's demands. Multiple witnesses, including defendant, confirmed that all three of the Mustang's passengers complied with defendant's orders and remained on the ground until he allowed them to get up, and there is no evidence whatsoever that anyone attempted to flee. This consideration supports plaintiff.

In summary, defendant approached a car reasonably suspecting that the driver had driven recklessly. He saw three unarmed and nonthreatening teens exit the damaged vehicle. He ordered them all to the ground at gunpoint without any of the three teens actively—or even passively—resisting his authority and commands. Moreover, he held them at gunpoint for roughly two minutes. In other words, plaintiff "had no [known] criminal record, cooperated throughout the ordeal, posed no immediate threat to [defendant], and did not resist arrest or attempt to flee, all of which are factors that tend to weigh against [d]efendant[]." *Binay*, 601 F.3d at 650. Given the context, defendant's conduct was objectively *unreasonable*, and it violated plaintiff's constitutional rights. *See, e.g.*, *Robinson v. Solano*, 278 F.3d 1007, 1015 (9th Cir. 2002) (en banc) ("[W]e have consistently applied the principle that drawing weapons and using handcuffs or other restraints is unreasonable in many situations."); *Petta v. Rivera*, 143 F.3d 895, 905 (5th Cir. 1998) (per curiam) ("A police officer who terrorizes a civilian by brandishing a cocked gun in front of that civilian's face may not cause *physical* injury, but he has certainly laid the building blocks for a section 1983 claim against him." (quoting *Checki v. Webb*, 785 F.2d 534, 538 (5th Cir. 1986)).

B.

For purposes of qualified immunity, it is not enough that a defendant violated plaintiff's constitutional rights. The rights violated must have been clearly established at the time—the second prong of the qualified-immunity analysis. *Bletz*, 641 F.3d at 750. "Clearly established

law" is not defined "at a high level of generality," *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011), but "must be 'particularized' to the facts of the case," *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

A plaintiff can meet his burden under this prong by presenting caselaw "with a fact pattern similar enough to have given 'fair and clear warning to officers' about what the law requires." *Hopper v. Plummer*, 887 F.3d 744, 755 (6th Cir. 2018). That case "need not be on all fours" with the instant fact pattern to form the basis of a clearly established right. *Id.* (quoting *Burgess v. Fischer*, 735 F.3d 462, 474 (6th Cir. 2013)). But the question must be so settled that "every reasonable official would have understood that what he is doing violates [the] right" at issue. *al-Kidd*, 563 U.S. at 741 (internal quotation marks omitted). And "an action's unlawfulness can be 'clearly established' from direct holdings, from specific examples describing certain conduct as prohibited, or from the general reasoning that a court employs." *Baynes v. Cleland*, 799 F.3d 600, 612 (6th Cir. 2015). To determine whether the law is clearly established "we must look first to decisions of the Supreme Court, then to decisions of this court and other courts within our circuit, and finally to decisions of other circuits." *Guertin v. State*, 912 F.3d 907, 932 (6th Cir. 2019) (quoting *Baker v. City of Hamilton*, 471 F.3d 601, 606 (6th Cir. 2006)).

As a general matter, we have long noted the right of citizens to be free from excessive force by police officers:

> "As the Supreme Court observed in *Saucier*, 'there is no doubt that *Graham v. Connor* clearly establishes the general proposition that use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness.'" *Vance v. Wade*, 546 F.3d 774, 784 (6th Cir. 2008) (quoting *Saucier*[ *v. Katz*], 533 U.S. [194,] 201–02 [(2001)]). . . . This Court has long recognized "that the Fourth Amendment permits detention using only 'the least intrusive means reasonably available.'" *Burchett v. Kiefer*, 310 F.3d 937, 946 (6th Cir. 2002) (quoting *United States v. Sanders*, 719 F.2d 882, 887 (6th Cir. 1983)).

*Binay*, 601 F.3d at 652. But more specifically, at the time of the confrontation defendant should have been on notice that his particular conduct was unreasonable under the Fourth Amendment. Our precedent, as well as that of other courts in this circuit and our sister circuits, establishes

that, without additional provocation, a plain-clothes officer may not hold at gunpoint an unarmed citizen suspected of a mere traffic violation.  And there was no such provocation here.

For example, we have held that officers were unreasonable in holding compliant residents of a family home at gunpoint for at least fifteen minutes (after any risk had subsided) during the execution of a search warrant.  In *Binay*, a drug task force executed a search warrant of a family's home and ordered all three family members (who were compliant and cooperative) to the ground at gunpoint, handcuffed them, and held them at gunpoint for anywhere from fifteen minutes to an hour while searching the home.  601 F.3d at 644.  This court held that, though "it is *sometimes* reasonable to use handcuffs and guns when detaining suspects[, that] does not support [the] [d]efendants' argument that the amount of force used *in this case* was objectively reasonable."  *Id*. at 649.  There, as here, the "[p]laintiffs had no criminal record, cooperated throughout the ordeal, posed no immediate threat to the officers, and did not resist arrest or attempt to flee," and therefore, this court affirmed the district court's denial of qualified immunity.  *Id*. at 650.  Because a jury could reasonably determine that the defendant's conduct in holding the plaintiffs "at gunpoint long after the risk of flight and risk to the officers subsided" was unreasonable, we held that there were sufficient facts alleged to show that the defendants violated the Fourth Amendment.  *Id*.

*Davis v. Bergeon* is even more enlightening.  187 F.3d 635; 1999 WL 591448 (6th Cir. 1999) (table).  After noting that the pointing or displaying of a firearm *could* constitute excessive force in certain circumstances, *Davis*, 1999 WL 591448, at *5, the court continued:

> [The defendant detective] was not in the process of an arrest, but inspecting the ladies' restroom.  [The plaintiff] was attempting to enter the men's restroom to use the facilities and was not suspected of any wrongdoing at that point in time. *[The defendant], dressed in plainclothes, allegedly did not identify herself, pointed her weapon at [the plaintiff] and ordered him to get on the floor.  We cannot say as a matter of law that [the defendant]'s actions under these circumstances did not constitute excessive force.*  Again, this presents a factual question for a jury to determine.  The district court erred by granting summary judgment on [the plaintiff]'s claims against [the defendant].

*Id*. at *5 (emphasis added).  Again, we held that those facts sufficed to allow a jury to find that the defendant had violated the plaintiff's clearly established Fourth Amendment rights and

remanded for trial. *Id*. at \*6–7. In other words, *Davis* held that a jury can determine under the law that a plain-clothes officer ordering an individual not suspected of criminal activity to the ground at gunpoint and holding the individual there for some time was an unreasonable violation of the individual's Fourth Amendment rights.

And in *Saad v. City of Dearborn*, No. 10-12635, 2011 WL 3112517, at \*4 (E.D. Mich. July 26, 2011), *aff'd sub nom. Saad v. Krause*, 472 F. App'x 403 (6th Cir. 2012) (per curiam), the court stated that we have "held that pointing a gun at an unarmed suspect who is not fleeing or posing a risk to police officers may be an objectively unreasonable use of force." Other district courts in this circuit have reached similar conclusions. *See, e.g.*, *Naselroad v. Mabry*, No. 5:14-389, 2015 WL 1412007, at \*3 (E.D. Ky. Mar. 26, 2015) ("The Fourth Amendment protects citizens from having a gun pointed at them where there is no suggestion of danger." (internal quotation marks omitted)); *Martin v. Coyt*, No. 1:10-CV-00176-R, 2012 WL 1574823, at \*14 (W.D. Ky. May 3, 2012) ("Drawing his weapon and pointing it at the [plaintiffs] may comprise a claim of excessive force.").

Our sister circuits confirm the clearly established nature of these principles. The First Circuit has held that "[a] reasonably competent officer also would not have thought that it was permissible to point an assault rifle at the head of an innocent, non-threatening, and handcuffed fifteen-year-old girl for seven to ten minutes, far beyond the time it took to secure the premises and arrest and remove the only suspect." *Mlodzinski v. Lewis*, 648 F.3d 24, 37–38 (1st Cir. 2011). In *Baird v. Renbarger*, the Seventh Circuit ruled that it was unconstitutional when the defendant "pointed a submachine gun at various people when there was no suggestion of danger, either from the alleged crime that was being investigated or the people he was targeting. The Fourth Amendment protects against this type of behavior by the police." 576 F.3d 340, 346 (7th Cir. 2009). That court continued by noting that many similar cases finding a constitutional violation involve children, "because they are much less likely to present the police with a credible threat. In other words, the unreasonableness of the gun-pointing is more apparent in these cases . . . ." *Id*. And other circuits have held similarly. *See, e.g.*, *Robinson v. Solano Cty.*, 278 F.3d 1007, 1015–16 (9th Cir. 2002) (*en banc*) (holding that pointing a gun at an unarmed suspect who poses no danger constitutes excessive force); *Holland v. Harrington*, 268 F.3d 1179,

1192–93 (10th Cir. 2001) (holding that detaining children at gunpoint after the officers had gained complete control of the situation "was not justified under the circumstances"); *Baker v. Monroe Twp.*, 50 F.3d 1186, 1193–94 (3d Cir. 1995) (holding that detention at gunpoint violated the Fourth Amendment as there was "simply no evidence of anything that should have caused the officers to use the kind of force they are alleged to have used").

In sum, and taking these cases together, at the time of this accident and confrontation defendant should have known that pointing his gun at plaintiff—a nonfleeing teenager whom he did not reasonably suspect of any prior crime beyond speeding and reckless driving—and holding him at gunpoint for roughly two minutes, violated plaintiff's Fourth Amendment rights. Therefore, viewing the evidence presented at trial in the light most favorable to plaintiff, the jury was permitted under these facts to answer "no" to the jury verdict form's question: "Was [defendant]'s show of force objectively reasonable?" Given our deference to the jury's role in determining the facts and applying them to the law, *Reeves*, 530 U.S. at 151, and our general view of the evidence in favor of the nonmoving party in qualified-immunity cases, *Champion*, 380 F.3d 893, 900, we conclude that the evidence presented to the jury was sufficient to overcome defendant's qualified-immunity defense. The district court's contrary ruling in granting defendant's motion for judgment as a matter of law was in error.[3]

## IV.

For these reasons, we reverse the judgment of the district court and remand for reentry of a judgment consistent with the jury's verdict.

---

[3]The district court granted judgment in defendant's favor on plaintiff's state-law claims as well, finding that Tennessee had its own qualified-immunity analog that precluded relief if plaintiff's rights weren't clearly established. *See, e.g.*, *Willis v. Neal*, 247 F. App'x 738, 745 (6th Cir. 2007) ("This court has previously held, as did the district court, that Tennessee law provides qualified or good faith immunity of government employees for state law torts."). Because the three claims rise and fall together on whether qualified immunity precludes relief, we need not independently address the Tennessee state-law claims. Our conclusion that plaintiff's evidence was sufficient to overcome defendant's qualified-immunity defense applies equally to all three causes of action.