NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0525n.06

No. 23-1897

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

Dec 17, 2024
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| GERALD JOSEPH SEGLER, | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| | ) | MICHIGAN |
| CITY OF DETROIT, MICHIGAN, a | ) | |
| municipal corporation; JAMES E. CRAIG, | ) | |
| | ) | |
| Defendants-Appellees. | ) | OPINION |

Before: MOORE, MURPHY, and BLOOMEKATZ, Circuit Judges.

MURPHY, J., delivered the opinion of the court in which BLOOMEKATZ, J., concurred, and MOORE, J., concurred in part and in the judgment. MOORE, J. (pp. 14–15), delivered a separate concurring opinion.

MURPHY, Circuit Judge. Over several months in 2018, an unknown person repeatedly shot at Detroit homes seemingly chosen at random. During a press conference about the shootings, Detroit Chief of Police James Craig held up a photo of Gerald Segler, described him as a "person of interest," and noted that he was known to walk the streets with an "assault type" rifle. Segler had no connection to the shootings and quickly cleared his name. But he says that the negative publicity harmed him. Mistaking Segler for the shooter, some private parties physically assaulted him while others refused to do business with him. Segler sued Craig and the City of Detroit under 42 U.S.C. § 1983. He alleged that Craig's decision to implicate him in the shootings violated the Due Process Clause and the Second Amendment. He also sought to hold the City liable on the ground that it had given Craig final policymaking authority over this decision. But the caselaw

existing at the time of the press conference did not clearly establish that Craig's actions violated the Constitution. Qualified immunity thus protects him from suit. And Segler has not shown that Craig had the authority to set the police department's policies over when to alert the media about a "person of interest" in a crime. So Segler cannot hold the City liable for his decision. We thus affirm the district court's grant of summary judgment to Craig and the City.

I

Beginning in July 2018, an unknown assailant shot up several homes in a neighborhood on the west side of Detroit, Michigan. Senior citizens lived in several of the victimized homes. The assailant shot into one elderly woman's home four different times. He fired over twenty rounds at another elderly couple's home. These dangerous and seemingly random crimes brought fear to the community.

At the start of November, the shootings picked up again. The surveillance video of one home captured fuzzy images of the hooded culprit firing shots late at night.

On November 8, Chief of Police James Craig held a press conference about the crimes. Craig said that the police had "identified a person of interest" and requested "the public's help[] to locate this person so that we can have a conversation and move forward in our investigation." Tr., R.37-2, PageID 411. Craig held up a picture of the man, explaining that this "person of interest" was "known in the neighborhood to open carry primarily assault type weapons." *Id.*, PageID 412. Craig clarified, though, that he was "not suggesting that this person of interest is a suspect in a shooting." *Id.*, PageID 416. Why did the police want to talk to him then? According to Craig, the person had "other issues" that Craig was "not at liberty to go into" apart from his lawful "open carry" of a rifle. *Id.*, PageID 418.

As it turns out, Gerald Segler was the man in the picture. He lived and worked in the community affected by the shootings. Known as "AR Joe" by residents, Segler often carried an AR-15 rifle primarily for protection from stray dogs.

On the same day as Craig's press conference, two local television stations ran stories about the shootings. After showing Segler's picture, one story noted that the police had identified him as a person of interest and wanted to speak with him about the shootings. This story included a clip from the press conference in which Craig explained that this person was known to carry assault-type weapons. The story also reiterated the random nature of the shootings. And a reporter concluded the story by telling the audience to call the police if they know or see the person of interest. The other station's story conveyed similar information.

The next morning, Segler and his lawyer visited the police department. He gave a "videotaped statement" answering all questions. Carson Decl., R.36, PageID 393. During this interview, his attorney also claims she learned from the police that they had "no evidence or basis to suspect" Segler in the shootings. Carson Decl., R.26, PageID 316. The interviewing detective allegedly told her that many police officers knew that Segler was not the shooter and passed this information on to Craig, but Craig opted to hold the press conference anyway.

Five days after this press conference, a local news station ran a short follow-up segment about Craig's press conference. In this story, Segler opined that his life had been "turned upside down" by the negative publicity. Video, R.18-3, at 0:03–:06. His attorney suggested that members of the community had sent Segler "death threats" and that he "had been attacked" recently. *Id.* at 0:20–:25. The television station also clarified that the police department no longer considered Segler a person of interest. According to Segler, the shooter was later identified as the grandson of one of the victims.

Segler sued Craig and the City of Detroit in state court. Aside from the physical injuries and threats on his life, Segler's complaint alleged that Craig's press conference had led unknown people to throw rocks at his home. It also alleged that Segler "suffered the loss of home improvement jobs and customers." Compl., R.1, PageID 13–14. As relevant now, Segler brought two federal claims under 42 U.S.C. § 1983. Segler asserted that Craig's identification of him as a person of interest violated his Fourteenth Amendment right to due process and his Second Amendment right to carry firearms. Segler also sought to hold the City liable on both claims under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). (He also asserted state-law theories but has since abandoned them.)

Craig and the City removed Segler's suit to federal court. Although represented by counsel, Segler opted not to depose Craig or take any discovery. Craig and the City moved for summary judgment. To rebut this motion, Craig relied on a video of the press conference and sworn declarations from his attorney.

Highlighting Segler's lack of effort during discovery, the district court granted summary judgment to Craig and the City. *Segler v. City of Detroit*, 2023 WL 5963773, at *2, *8 (E.D. Mich. Sept. 13, 2023). The court first held that qualified immunity protected Craig. *Id.* at *5–6. It next rejected Segler's claims against the City under *Monell* because Segler failed to connect Craig's allegedly unconstitutional conduct to a city policy or custom. *Id.* at *7.

Segler has appealed. He renews both his constitutional claims against Craig and his *Monell* claims against the City. We review the district court's grant of summary judgment de novo. *Pineda v. Hamilton County*, 977 F.3d 483, 489 (6th Cir. 2020).

## II. Claims Against Craig

In the district court, Segler alleged that Craig's decision to implicate him in the shootings violated both the Due Process Clause (because Craig did so without adequate process) and the Second Amendment (because Craig did so in retaliation for Segler's open carry of a rifle). Craig responded by invoking qualified immunity under § 1983. Contrary to Segler's claim that Craig had to prove the applicability of this defense, our caselaw places the "burden" on Segler to rebut it. *Jones v. Clark County*, 959 F.3d 748, 766 (6th Cir. 2020), *overruled on other grounds by Thompson v. Clark*, 596 U.S. 36 (2022). To defeat qualified immunity, Segler must establish two things. *See District of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018). He must show that Craig's actions did, in fact, violate the Due Process Clause and the Second Amendment. *See id.* And he must show that the caselaw existing at the time of Craig's press conference "clearly established" these violations. *Id.* at 63 (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).

We may address these two qualified-immunity elements in the order that makes the most sense for each case. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). In this case, we find it easiest to resolve Segler's claims by jumping immediately to the "clearly established" element without deciding whether Craig violated Segler's constitutional rights. *See Beck v. Hamblen County*, 969 F.3d 592, 599 (6th Cir. 2020). This element requires Segler to show that any "reasonable official" in Craig's position would have recognized that his conduct exceeded constitutional bounds. *Wesby*, 583 U.S. at 63 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). Except in obvious cases, this test requires plaintiffs to identify the constitutional rule that the state actor allegedly violated with particularity—not at a high level of generality (such as the general right to "due process"). *See id.* at 63–64; *Reichle*, 566 U.S. at 665. The need for specificity, in turn, usually compels plaintiffs to identify caselaw that clearly establishes the specific rule on which they rely.

*See Wesby*, 583 U.S. at 64; *see also Reichle*, 566 U.S. at 665–70; *Beck*, 969 F.3d at 599–600. Here, however, Segler identifies no case that would have made it clear to Craig that his decision to implicate Segler at the press conference violated either the Due Process Clause or the Second Amendment. We will address each right in turn.

*Due Process Clause.* The Fourteenth Amendment prohibits state actors from "depriv[ing]" a "person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Before deciding whether a state actor has provided adequate "process" for purposes of making out a procedural due-process claim, this text requires a plaintiff to show that the actor deprived the plaintiff of a protected interest—typically, a protected "liberty" or "property" interest. *Id.*; *see Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999). As relevant to Segler's claim, the Supreme Court has long held that people do not have a constitutional liberty or property interest in their reputations *alone*. *See Paul v. Davis*, 424 U.S. 693, 711–12 (1976). To establish that a state actor's false statement violated due process, then, the plaintiff must show that the state actor deprived the plaintiff of some *other* interest "previously held under state law" in addition to the asserted reputational injury. *Id.* at 708; *see Cutshall v. Sundquist*, 193 F.3d 466, 479 (6th Cir. 1999).

Two Supreme Court cases show how this so-called "stigma-plus" test operates in practice. *Compare Paul*, 424 U.S. at 711–12 *with Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971). On the one hand, *Paul* confirms that state actors need not provide any process before they harm a person's reputation alone. There, two police chiefs distributed a flyer to local businesses that included a list of recent individuals arrested for shoplifting. *Paul*, 424 U.S. at 694–95. The plaintiff's mug shot and name appeared on this list because the police had recently arrested him for shoplifting. *Id.* at 695–96. But prosecutors soon dismissed the charges against the plaintiff. *Id.* at 696. His employer later questioned him about the flyer but decided not to fire him. *Id.* The

Court held that the plaintiff's due-process claim failed because he had not identified any harm apart from the reputational injury resulting from the distribution of the flyer. *Id.* at 711–12.

On the other hand, *Constantineau* confirms that a loss apart from a damaged reputation can trigger the need for process. There, a police chief ordered the posting of a notice at all liquor stores that barred the stores from selling alcohol to the plaintiff pursuant to a state law. *Constantineau*, 400 U.S. at 434–35. The Court held that the Due Process Clause entitled the plaintiff to "notice and an opportunity to be heard" before the chief could post this notice. *Id.* at 436. Critically, the chief deprived the plaintiff of something *more* than just her good name. He used government power to legally bar her from "purchas[ing] or obtain[ing] liquor in common with the rest of the citizenry." *Paul*, 424 U.S. at 708; *see Constantineau*, 400 U.S. at 437.

Segler argues that his case looks more like *Constantineau* than *Paul*. Conceding that he must establish more than reputational harm, he claims that Craig's decision to characterize him as a "person of interest" in the shootings injured other interests. Specifically, Segler asserts that Craig's press conference led some third parties to assault him. And he asserts that the press conference led other third parties to refuse to do business with him. At first blush, Segler's claim might look plausible. After all, private parties have a liberty interest in their bodily integrity that state actors can infringe by physically assaulting them. *See, e.g.*, *Webb v. McCullough*, 828 F.2d 1151, 1158 (6th Cir. 1987). And private parties can sometimes satisfy the stigma-plus test if they allege that the government terminated them from a public job in the course of defaming them. *See, e.g.*, *Kaplan v. Univ. of Louisville*, 10 F.4th 569, 583–84 (6th Cir. 2021); *see also Owen v. City of Independence*, 445 U.S. 622, 633 n.13 (1980).

But Segler's allegations contain a critical difference from *Constantineau*. In that decision, the state actor himself deprived the plaintiff of the additional interest (the right to buy alcohol).

7

*Constantineau*, 400 U.S. at 437. In this case, by contrast, Segler alleges that unknown *private parties*—not a *state actor* like Craig—deprived him of the additional interests (the right to bodily integrity or to business). This distinction reveals the important legal question on which Segler's case hinges: May a plaintiff satisfy the "plus" element of the Supreme Court's "stigma-plus" test by showing that private parties harmed the plaintiff because of a state actor's false statements?

We can save our answer for another day. Segler has not cited a single case that has adopted his stigma-plus theory tying the "stigma" (reputational harms) from a state actor's defamation to the "plus" (tangible injuries) from a private party's actions. That fact dooms his theory in this qualified-immunity context. It shows that nothing in the existing caselaw clearly establishes the theory with the required "degree of specificity." *Wesby*, 583 U.S. at 63 (quoting *Mullenix v. Luna*, 577 U.S. 7, 13 (2015) (per curiam)); *see Reichle*, 566 U.S. at 665. Nor is Segler's theory the type of "obvious" extension of existing law that would excuse his failure to identify any on-point precedent. *Wesby*, 583 U.S. at 64. To the contrary, the existing caselaw could reasonably be read to cut the other way. In *Paul* itself, the Court assumed that the flyer describing the plaintiff as an active shoplifter "would seriously impair his future employment opportunities." 424 U.S. at 697. The Court nevertheless held that this type of defamation does not suffice unless the plaintiff identifies something else that the "*government*"—not a private party—"is doing to" the plaintiff. *Id.* at 708 (quoting *Constantineau*, 400 U.S. at 437) (emphasis added). Likewise, we have held that a state law that allowed officials to publicly disclose a person's sex offenses did not satisfy the stigma-plus test even if that public disclosure would make *private* employers less likely to hire him. *See Cutshall*, 193 F.3d at 479–80. At day's end, though, we need not resolve this question. We need only conclude that the existing caselaw does not clearly establish Segler's view of the law. So Craig is entitled to qualified immunity.

*Second Amendment.* As incorporated against the States by the Fourteenth Amendment, the Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II; *see McDonald v. Chicago*, 561 U.S. 742, 750 (2010). The Supreme Court has held that this text prohibited a law that "totally ban[ned] handgun possession in the home." *District of Columbia v. Heller*, 554 U.S. 570, 628–29 (2008). And the Court has held that the text prohibited a law that did not permit an individual to publicly carry a firearm outside the home except on a "showing of some additional special need." *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 11 (2022). At the same time, *Bruen* postdates Craig's press conference and so cannot qualify as the type of "clearly established" law on which we can rely in his case. *See Lawler ex rel. Lawler v. Hardeman County*, 93 F.4th 919, 927 (6th Cir. 2024). That fact just leaves *Heller*.

Regardless, Segler's claim resembles neither *Heller* nor *Bruen*. He does not allege that Michigan law prohibited him from possessing firearms in the home (like the law in *Heller*) or from open carrying firearms in public (like the law in *Bruen*). Indeed, Craig conceded at his press conference that Michigan law did not make it a "crime in and of itself" for Segler "to open carry" his rifle. Tr., R.37-2, PageID 418. As best we can tell, Segler instead argues that Craig violated the Second Amendment because Craig implicated him in the shootings in *retaliation* for his decision to carry an AR-15 rifle outside the home. In this respect, Segler seeks to incorporate into the Second Amendment our well-established test for retaliation claims under the First Amendment. *See, e.g.*, *Lemaster v. Lawrence County*, 65 F.4th 302, 307 (6th Cir. 2023); *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc) (plurality opinion). Under that test, plaintiffs who allege that state actors retaliated against them in violation of the First Amendment must prove that they engaged in protected speech, that the state actor took an "adverse action" against them, and

that a sufficient "causal connection" ties the adverse action to the speech. *Lemaster*, 65 F.4th at 307, 309. Applied here, then, Segler treats his open carry of an AR-15 as "protected" conduct; he treats Craig's press conference implicating him in the shootings as an actionable "adverse action"; and he says that his open carry caused Craig to engage in this allegedly harmful conduct. *See id.*

The problem for Segler? As with his due-process claim, he does not cite a single decision that has extended this First Amendment retaliation framework to the Second Amendment. Here again, then, Segler fails to identify existing caselaw with the required "degree of specificity." *Wesby*, 583 U.S. at 63 (quoting *Mullenix*, 577 U.S. at 13); *see Reichle*, 566 U.S. at 665. Nor do we find it "obvious" whether (or how) this test should apply in the Second Amendment context. *Wesby*, 583 U.S. at 64 (citation omitted). After all, the Supreme Court has adopted a test under the Second Amendment that requires us to examine "the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. Yet Segler does not identify any history on the question that this case implicates: Can government actors "infringe[]" the "right" to "keep and bear Arms" not just through direct regulations of those arms but also through other actions that indirectly chill the exercise of this right? U.S. Const. amend. II. So Segler again fails to show that existing caselaw clearly establishes his proposed rule. And Craig is again entitled to qualified immunity.

One last point. Segler at times mixes and matches his claims under the Due Process Clause and the Second Amendment. To establish an adequate "liberty" interest for his due-process claim, he attempts to combine the "stigma" from Craig's allegedly defamatory statements with an additional "plus": the chill that Craig's conduct caused to his Second Amendment right to carry firearms. Yet, unlike the notice in *Constantineau* (which legally barred the plaintiff from buying alcohol), Craig's press conference did not *legally* deprive Segler of any right to carry firearms. *See* 400 U.S. at 437. At most, Segler claims that this press conference *practically* deprived him of

10

this right because he feared being recognized if he went outside with his rifle. For a final time, however, Segler fails to show any caselaw that would clearly establish this alternative due-process theory. *See Wesby*, 583 U.S. at 63. He thus cannot seek damages from Craig based on the theory.

## III. Claims Against Detroit

Segler also appeals the dismissal of his claims against the City of Detroit under § 1983. But he cannot automatically hold the City liable for Craig's allegedly unconstitutional actions under a vicarious-liability theory. *See Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997). Rather, Segler must connect those actions to an official "policy" or unofficial "custom" of the City. *See id.* at 403–04; *Monell*, 436 U.S. at 690–91.

Plaintiffs can show this type of municipal "policy" or "custom" in different ways. *See Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005). As relevant to Segler's claims, they may show that the municipality delegated its power to set a policy or custom to the official who made the allegedly unconstitutional decision. *See Lemaster*, 65 F.4th at 313. This theory requires plaintiffs to prove that the relevant official had both "final" and "policymaking" power over the challenged decision under state law. *Miller v. Calhoun County*, 408 F.3d 803, 813–14 (6th Cir. 2005); *see City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988) (plurality opinion); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 482–83 (1986) (plurality opinion). To have "policymaking" power, we consider whether the official has the authority to set the municipality's general plans for carrying out an activity (such as the general plans for providing medical care to inmates). *See Miller*, 408 F.3d at 814. It does not suffice if the official has only the "mere authority to exercise discretion" under those general plans (such as the discretion to decide how to treat a specific inmate on a specific occasion) unless the official's decisions are "not constrained by the official policies of superior officials." *Id.* (quoting *Feliciano v. City of Cleveland*, 988 F.2d 649,

11

655 (6th Cir. 1993)); *see Praprotnik*, 485 U.S. at 126–27 (plurality opinion); *Jones*, 959 F.3d at 762. To have "final" power, the official must have the "unreviewable" authority to set the policy free from any veto by superiors. *Miller*, 408 F.3d at 814 (quoting *Feliciano*, 988 F.2d at 655).

Segler has not met this test. We long ago recognized that Detroit's City Charter vests its Board of Police Commissioners with the authority to set the Detroit Police Department's general policies. *Berry v. City of Detroit*, 25 F.3d 1342, 1345 (6th Cir. 1994). The Chief of Police, by contrast, has the authority to run the department in conformity with these policies and to recommend amendments to the Board. *See id.* at 1345. These provisions of Detroit's City Charter remain in place today. *See* Detroit City Charter §§ 7-803(1), 7-806(1)–(2). Segler identifies no state or local law that gave Craig the unreviewable power to set the policies governing when officers may notify the media about "people of interest" during a criminal investigation. *See Miller*, 408 F.3d at 814. Nor does Segler identify any informal custom delegating this policymaking authority to the Chief of Police. *See Feliciano*, 988 F.2d at 655–56. Segler's evidence thus fails to create a genuine issue of material fact over whether Craig had "final policymaking authority" over this general activity. *Praprotnik*, 485 U.S. at 124 (plurality opinion) (quoting *Pembaur*, 475 U.S. at 483 (plurality opinion)).

Segler responds that Craig (not the Board) chose the *specific* "policy" to label him a person of interest. Appellant's Br. 40. But we have repeatedly made clear that an official's "discretion" to make a specific decision pursuant to a general policy does not qualify as final policymaking authority. *Praprotnik*, 485 U.S. at 126 (plurality opinion). For example, just because a city's policies gave an officer "discretion" in how to proceed with an investigation does not mean that the officer had general policymaking power over investigations. *Jones*, 959 F.3d at 762–63. And just because a city's policies gave a shift commander the "authority to make limited decisions

12

concerning inmate medical care" does not mean that the commander had general policymaking authority over that care. *Miller*, 408 F.3d at 814. This case follows the same path. Even if the Board's policies gave Craig "discretion" over whether to identify Segler as a person of interest, this fact does not show that Craig exercised general policymaking power over the general activity of communicating with the media. *Praprotnik*, 485 U.S. at 126 (plurality opinion).

\* \* \*

All told, qualified immunity shields Craig from liability for his decision to describe Segler as a "person of interest" at a press conference. And Segler cannot hold the City liable because he has not shown that Craig had final policymaking authority over this activity.

We affirm.

**KAREN NELSON MOORE, Circuit Judge, concurring in the judgment.**  I join Part III of the majority opinion and concur in the judgment, but write separately to address defendant James Craig's qualified-immunity defense.

Plaintiff Gerald Segler alleges that, while acting as City of Detroit Police Chief, Craig violated Segler's procedural-due-process and Second Amendment rights when Craig publicly (but mistakenly) identified Segler as a person of interest in a series of shootings, citing Segler's propensity openly to carry firearms in the area of the shooting.  But Segler has not shown that either of those rights was clearly established in the context of this case, which he must do in order to defeat Craig's qualified-immunity defense.

"Where a defendant raises the defense of qualified immunity, 'it is the plaintiff's burden to show that the defendants are not entitled to qualified immunity.'"  *Moody v. Mich. Gaming Control Bd.*, 871 F.3d 420, 425 (6th Cir. 2017) (quoting *Burgess v. Fischer*, 735 F.3d 462, 472 (6th Cir. 2013)).  In his answer, Craig raised qualified immunity as a defense.  R. 5 (Craig Answer at 7) (Page ID #70); *see also* R. 18 (Mot. Summ. J. at 10–15) (Page ID #218–23).  The burden thus shifted to Segler to demonstrate that Craig violated a constitutional right that was clearly established at the time of the violation.  *Moody*, 871 F.3d at 425.  Ordinarily, and as relevant here, "[a] plaintiff can meet his burden [to show a right is clearly established] . . . by presenting caselaw 'with a fact pattern similar enough to have given fair and clear warning to officers about what the law requires.'"  *Vanderhoef v. Dixon*, 938 F.3d 271, 278 (6th Cir. 2019) (quoting *Hopper v. Plummer*, 887 F.3d 744, 755 (6th Cir. 2018)).

Although courts have recognized that a government actor's stigmatizing false statement may work a due-process violation where it deprives an individual of an independent liberty or property interest, *see Paul v. Davis*, 424 U.S. 693, 710–12 (1976), Segler has proffered no cases

finding a due-process violation where, as here, the alleged defamatory action prompted third parties, rather than the government, to deprive a plaintiff of their liberty or property interest. Nor has Segler presented any cases establishing a Second Amendment right to openly carry a gun without stigma or retaliation. Both fact patterns are instrumental to the constitutional violations that Segler alleges and Craig's notice thereof. Accordingly, Craig is entitled to qualified immunity, and Segler's claims under 42 U.S.C. § 1983 cannot succeed.

For the foregoing reasons, I concur in the judgment.